Pages 1 - 142

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Beth Labson Freeman, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )   **NO. CR 17-00603 BLF**
                               )
LIANG CHEN,                    )
DONALD OLGADO,                 )
WEI-YUNG HSU, and              )
ROBERT EWALD,                  )
                               )
          Defendants.          )
_____)

San Jose, California
Thursday, June 24, 2021

**TRANSCRIPT OF FINAL PRETRIAL CONFERENCE**

**APPEARANCES:**

For Plaintiff:
                    STEPHANIE M. HINDS
                    ACTING UNITED STATES ATTORNEY
                    150 Almaden Boulevard, Suite 900
                    San Jose, California  95113
            BY:  **JEFFREY D. NEDROW**
                 **SUSAN F. KNIGHT**
                 **ASSISTANT UNITED STATES ATTORNEYS**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**



Reported By:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official U.S. Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant Chen:
                            ARGUEDAS, CASSMAN & HEADLEY LLP
 3                          803 Hearst Avenue
                            Berkeley, California 94710
 4                  BY:   THEODORE W. CASSMAN, ATTORNEY AT LAW
                          RAPHAEL M. GOLDMAN, ATTORNEY AT LAW
 5

 6

 7   For Defendant Olgado:
                            LAW OFFICE OF LELAND ALTSCHULER
 8                          2995 Woodside Road
                            Woodside, California 94062
 9                  BY:   LELAND B. ALTSCHULER, ATTORNEY AT LAW
                          JANIE R. HAYDEN, ATTORNEY AT LAW
10

11   For Defendant Hsu:
                            NOLAN BARTON & OLMOS LLP
12                          600 University Avenue
                            Palo Alto, California 94301-2019
13                  BY:   DANIEL B. OLMOS, ATTORNEY AT LAW

14

15   For Defendant Ewald:
                            BRUCE C. FUNK LAW OFFICES
16                          46 West Santa Clara Street
                            San Jose, California 95113
17                  BY:   BRUCE C. FUNK, ATTORNEY AT LAW

18

19   Also Present:

20   For Applied Materials:
                            MUNGER TOLLES & OLSON LLP
21                          560 Mission Street, 27th Floor
                            San Francisco, CA 94105-2907
22                  BY:   JEROME C. ROTH, ATTORNEY AT LAW

23

24

25
```

| | |
|---|---|
| **Thursday - June 24, 2021** | **1:32 p.m.** |

**P R O C E E D I N G S**

**---o0o---**

(Defendants present, out of custody.)

**THE COURT:**  Good afternoon, everyone.  Please be seated.

**MR. NEDROW:**  Good afternoon, Your Honor.

**MR. CASSMAN:**  Good afternoon, Your Honor.

**MS. KNIGHT:**  Good afternoon, Your Honor.

**THE COURT:**  All right.  Before we get started and call the case, you can all see that I'm not wearing a mask.  I am imposing the new court procedure in our courtroom.

If you certify to me by your action that you are fully vaccinated, you may, if you wish, remove your mask.  You're welcome to wear a mask if it makes you more comfortable.  And I'm glad that it will give you -- it's going to be a long afternoon, and that will make people more comfortable.

Let me just say that for each side -- and this is before we call the case -- for each side, your witnesses do not need to wear masks if you can certify to me that you're satisfied that they are fully vaccinated.  I will not be questioning the witness, but I will expect that you have taken that on.

And if you have a witness who is not fully vaccinated and you want them to testify without a mask, you'll need to bring it to my attention individually.  If it doesn't arise, we don't have to address it.  If it does arise, let's talk about it and

 1   see where we are.  Okay?

 2        **MS. KNIGHT:**  Thank you.

 3        **MR. NEDROW:**  Thank you, Your Honor.

 4        **MR. CASSMAN:**  Thank you, Your Honor.

 5        **THE COURT:**  All right.  Let's call the case and get your

 6   appearances.

 7        **THE CLERK:**  Calling Case 17-0603, United States versus

 8   Liang Chen, co-defendant Donald Olgado, co-defendant Wei-Yung

 9   Hsu, and co-defendant Robert Ewald.

10        Counsel, please state your appearances.

11        **MR. NEDROW:**  Good afternoon, Your Honor.  Jeff Nedrow for

12   the United States.

13        **MS. KNIGHT:**  Good afternoon, Your Honor.  Susan Knight for

14   the United States.

15        **MR. CASSMAN:**  Good afternoon, Your Honor.  Ted Cassman and

16   Raphe Goldman, Raphael Goldman, appearing on behalf of Liang

17   Chen.  And Dr. Chen is present in the courtroom.

18        **THE COURT:**  Hello, Dr. Chen.  Welcome.

19        **MR. ALTSCHULER:**  Good afternoon, Your Honor.  Leland

20   Altschuler on behalf of Donald Olgado, who is present in the

21   courtroom.

22        **THE COURT:**  Good morning.  Welcome.

23        **MR. ALTSCHULER:**  And if I may, I'd like to introduce my

24   colleague, Ms. Janie Hayden.

25        **THE COURT:**  Yes.

1    **MR. ALTSCHULER:**  The Court had executed a pro hac vice

2    order for her.

3    **THE COURT:**  Thank you.  And welcome.

4    **MS. HAYDEN:**  Good afternoon, Your Honor.

5    **THE COURT:**  Good afternoon.

6    **MR. OLMOS:**  Good afternoon, Your Honor.  Daniel Olmos

7    appearing with Mr. Hsu.  Mr. Hsu is also present in the

8    courtroom.

9    **THE COURT:**  Hello, Mr. Hsu.

10   **MR. FUNK:**  Good afternoon, Your Honor.  Bruce Funk for

11   Robert Ewald.  He is also present in the courtroom.

12   **THE COURT:**  Mr. Ewald, good afternoon.

13   All right.  I don't believe I've seen any of the

14   defendants for quite some time, which is good because it

15   relieved you of the obligation of coming to court.

16   It is also a real pleasure to have everyone in the

17   courtroom.  We have a lot of work ahead of us anyway, and doing

18   it on Zoom makes it much more difficult.  So although I'll be

19   dodging plexiglass barriers and if you see me moving around,

20   it's because I'm sitting behind a post in the cheap seats over

21   here and I'm trying to see your face.

22   So let me describe what I expect to accomplish today at

23   our final pretrial conference.

24   I'm going to spend a fair amount of time going over the

25   logistics of the trial and answering your questions, and then I

1    will turn to the in limine motions.

2        And normally, I can promise that I will have ruled on all

3    of them before the end of the afternoon.  However, you gave me

4    extra gifts this time, and I don't know that I can get through

5    all 26 of them.  I'm not going to rush.

6        We'll come back next Tuesday afternoon if we're not done.

7    And depending on how much we have left, if any, I may be

8    willing to convert it to Zoom to save you the wear and tear and

9    the drive.  But let's see how it goes.  And I'm here.  So it's

10   of no moment to me.  But I have a long drive; so I really

11   appreciate that you do as well.  And if we have a good

12   foundation on getting through today, it may not be necessary

13   for us to be in the courtroom.  But if anyone wants to be, as I

14   say, it's of no moment to me.

15       All right.  It looks, from where I sit, that our trial

16   date is firm at this point and that many of the Court's COVID

17   restrictions have been modified.  That will address many of the

18   concerns that were raised in the papers that we'll go over

19   today and that were raised at our last status conference.  And

20   so I'm really relieved that we can proceed in that way.  There

21   will still -- clearly, there are going to be some restrictions,

22   and we want to respect our jurors' feeling of health safety

23   while they're in the courtroom.

24       We will be using Courtroom 1 at the other end of the

25   hallway.  It's a little bit bigger, although, actually, not

1  much.  And I am prepared to -- and we'll certainly have a
2  walk-through for you, if you want, just so you can figure out
3  the logistics of the courtroom.
4      So if there's nothing anyone needs to bring to my
5  attention, I'm going to start on my -- I have a long list of
6  things I'd like to go over, and I welcome your interruptions if
7  you need clarity or if you would like to suggest something
8  else.
9      So we will begin with our jury selection.  I anticipate
10 that we will use a questionnaire.  I can't send it out in
11 advance.  We're not doing that anymore.  And so I've requested
12 authority -- because I'm not in charge of much when it comes to
13 the building -- to have jurors come in on the Friday,
14 July 23rd, for the purpose of filling out the lengthy
15 questionnaire that we'll get to in a few minutes.
16     The questionnaire will only be -- I can only do it if one
17 side or the other takes on the job of Xeroxing it and bringing
18 the originals back to me, and I'll need them by the end of
19 that day so that I can read them as well.  And then, on the
20 Monday morning, July 26, we'll begin the oral voir dire of the
21 jurors.
22     And in normal times, that's what I always do.  But I think
23 that ought to -- and that's probably what you're used to as
24 well.  And I think that ought to work out.  So --
25     **MR. FUNK:**  Your Honor, the defense has agreed that we'd

1  take the laboring oar of getting them, copying them all,

2  getting them back to everybody, if the Government is happy with

3  that.

4      **THE COURT:**  That's generous.

5      **MR. NEDROW:**  Yes, that's very generous.  And we're

6  certainly happy to assist with that as well.  We can discuss

7  and confer.  We can split it up.  But we appreciate that very

8  much.

9      **THE COURT:**  Good.  Thank you, Mr. Funk.  I really

10 appreciate that.

11      And with the questionnaires, you'll each have your copies

12 of them.  And it is my order that you are to return all copies

13 of the questionnaires at the end of the trial; that they are to

14 be used for no purpose other than this trial; that any jury

15 consultants or other consultants who you have are not

16 authorized to retain any of the information about jurors,

17 although most certainly you are welcome to share it with anyone

18 who you are consulting with on the jury selection and the

19 parties.  But there is confidential information.  And you can

20 bring your copies back to me or simply affirm to me that you

21 have shredded them.

22      All right.  In terms of our trial hours, on Mondays,

23 Wednesday, and Fridays we will be in session from 9:00 until

24 5:00.  On Tuesdays we start at 10:00 -- I have my criminal

25 calendar in the morning -- and go until 5:00.

1          And on Thursdays we are dark, with the exception of jury

2     deliberation.  I'm here.  I'm just -- I have civil matters

3     all day on Thursday.  So you won't need to present witnesses on

4     Thursdays.

5          I don't believe you gave me an estimate of the trial time.

6     I estimate that we have 25 hours a week on the record.  It may

7     be -- I actually estimate 26 and a half, but things get a

8     little bit slow.

9          So with that in mind, Mr. Nedrow, do you have an estimate

10    for the time the Government will need?

11         **MR. NEDROW:**  Yes, Your Honor.  We estimated approximately

12    12 days, actual trial days, not --

13         **THE COURT:**  Trial days, yes.

14         **MR. NEDROW:**  Yes, which would be 96.  We think that's on

15    the higher end, and we're very optimistic that as the case

16    proceeds, as well as through stipulations and things of that

17    sort, that time may shrink up a bit; but that's the time that

18    we came up with.

19         **THE COURT:**  And when you say that's 96, I don't know what

20    you mean.

21         **MR. NEDROW:**  Your Honor, unless -- I'm seeing if my

22    math failed.

23         **THE COURT:**  Six hours a day times 12.

24         **MR. NEDROW:**  I apologize.  I was going with eight, and I

25    wasn't paying close attention to the Court.

1          So we're going to need 12 trial days.  I think maybe when

2     we put 12 days in our pretrial statement, we were thinking

3     eight; and, of course, that's a bit of an inflated day.  So

4     maybe the best way we can think of it is approximately 13 of

5     the Court's days, which would come out to 13 six-hour days.

6     I think -- I still think that's within range of what we can

7     accomplish from the --

8          **THE COURT:**  Okay.

9          **MR. NEDROW:**  -- Government's perspective.

10         **THE COURT:**  For the defense?

11         **MR. CASSMAN:**  Your Honor, we estimate four days.

12         **THE COURT:**  Okay.  Good.  Well, that works.  That seems --

13    I mean, I can't limit you, except to say in all cases, we have

14    a need to move cases along because we need to respect the jury,

15    but now it's even more important that we move along.

16         I will expect that if you are putting on your case, that

17    you will have enough witnesses to last until the end of

18    the Court day; and if you don't, you will rest.

19         So I'm more than glad to make seating available in the

20    hallway for all of your witnesses starting on Monday morning,

21    the 26th.  And I'm more than glad to order them to be here day

22    to day until the trial concludes.

23         But if you get to 2:00 or 3:00 in the afternoon and you've

24    run out of witnesses, it's fine with me.  We'll just move along

25    and you will be done.

1    And I mean that jointly among the defendants, because if

2    one rests, I move to the next.  And if you have no witnesses,

3    then you will have rested.

4    So it's the only thing I can do, and I think you all -- I

5    don't think you'll have any trouble with it.  I actually am not

6    worried about that.

7    With a 17-day trial estimate, I -- well, I had actually

8    estimated perhaps 20.  I'm really happy to think of it as being

9    less.  I think, then, it's -- let's see.

10    **MR. FUNK:**  Your Honor, we also have to include the opening

11    statements and the jury selection.  I think they were talking

12    about evidentiary days.

13    **THE COURT:**  Oh, no.  I understand that.  Oh, absolutely,

14    yes.

15    I need to advise the jury, the big panel, how long they

16    can expect to be here so that I can consider hardship.  So I'm

17    not limiting you.  I need your best estimate.  And no jury ever

18    was unhappy about going home early, but they're pretty unhappy

19    about staying late.

20    So I think it's even possible to have opening statements

21    on the 26th, but I was assuming we'd start on July 27.  And you

22    need to be ready.  If the jury selection goes fast, I'm not

23    going to send them home.  We just get started.

24    And so I think then that -- let's see.  The evidence may

25    close by August 20, and then closing arguments may be the 23rd.

```
 1   These are estimates.  If you finish the evidence a day early,

 2   we're not going to go home for a day.  We'll go home for a

 3   few -- I mean, I'm not going to start closing arguments at 3:00

 4   in the afternoon.  But we don't take a little vacation while

 5   you work on your closing argument.  And the jury instructions

 6   will be done.  So please just keep that in mind.  And, I mean,

 7   we'll know along the way, but I want you to understand that.

 8        And so in terms of deliberation, if -- I'm just trying to

 9   do my math here.  I think it is reasonable, then, to tell the

10   jury that they will be here through August 27.  I think that's

11   the outside.

12        Do you agree?

13        MR. CASSMAN:  Yes.

14        MR. NEDROW:  Yes.

15        THE COURT:  Again, they don't get to go home just because

16   we've reached the magic day.  But is that a reasonable

17   estimate?

18        MR. NEDROW:  Yes.

19        THE COURT:  That gives them almost a week for

20   deliberation, which could happen.

21        Okay.  So in terms of the schedule, I will be here at 8:30

22   every day for any motions that we can deal with outside the

23   presence of the jury.

24        We're going to have to see if we can work out the sidebar.

25   We suspended it before the vaccines, and so they were all
```

1    unreported.  We'll see how that goes as to whether we can get

2    our little microphone and we all want to breathe into it.  I'm

3    not sure.  I'm actually not sure how we're going to do that,

4    but we'll move on from that.

5        In terms of the morning objections, you are welcome, but

6    not required, to file something for me to consider for that

7    morning.  If you file something, each side may have

8    three pages, and it must be filed by 5:00 p.m. on the court day

9    before our 8:30 session.  So that means if you want to get

10   together on a Monday morning, you're filing it on Friday by

11   5:00 p.m.  I will also require that you e-mail whatever that is

12   to me so that I'm sure I get it.

13       And when we're off the record, I will collect from you

14   e-mail addresses and give you mine.  And you can expect that I

15   will communicate regularly with you by e-mail.  It's quick.

16   It's off the record.  You can put anything on the record you

17   want.  Anything you e-mail to me that you want filed, please

18   do.  It's just access for me.  And, you know, if it's late, I

19   don't want to have to go into the Court's system late at night.

20   But you're not required to file anything, and no opposition is

21   required at all.  You can do it orally.  So I'm not expecting

22   you to file a written opposition at midnight.  I'm expecting

23   you to come in in the morning and we'll talk about whatever the

24   issue is.

25       So in terms of the courtroom COVID protocols -- yes,

1    Mr. Cassman?

2        **MR. CASSMAN:**  Your Honor, before we leave scheduling --

3        **THE COURT:**  Sure.

4        **MR. CASSMAN:**  -- just a clarification.

5        What is the Court's policy with regard to recesses and

6    lunch?

7        **THE COURT:**  Oh, yes.  We do both.

8                        (Laughter.)

9        **THE COURT:**  So, generally, I take one 15-minute break in

10   the morning.  We take an hour for lunch as close to 12:00 to

11   1:00 as possible.  And I try to take two shorter breaks in the

12   afternoon.  And it's rare that I go more than an hour and a

13   half to an hour and 15 minutes without a break.  I really try

14   to watch that carefully.

15       Any other questions on just the schedule?

16       **MR. CASSMAN:**  No.  Thank you, Your Honor.

17       **THE COURT:**  All right.  So another issue that I know we

18   had some real concerns about before was witnesses, and even

19   jurors, being masked.

20       So the Court's new -- you probably saw the signs when you

21   came in.  If you're fully vaccinated, you don't need to wear a

22   mask unless you want to.  And we've eliminated distancing.  So

23   that doesn't mean everyone's comfortable with that, but it's

24   permitted.

25       I'm going to talk about jurors.  We won't really know

1    whether they're vaccinated or not.  I'll make the same sort of

2    announcement to them, that if they're fully vaccinated, they

3    are welcome, but not required, to remove masks; and if they're

4    not vaccinated, they must wear masks.

5        Now, I think there was some concern about picking a jury

6    without being able to actually see their faces.  And I'm not

7    really comfortable with an unvaccinated person taking their

8    mask off, and I don't know that they would be comfortable

9    either.  So in Santa Clara County and our southern counties

10   that we'll draw on, we know the vaccination rates are very

11   high.  I'm certainly willing to listen to more.  I've picked a

12   number of juries -- all our judges have -- with masked jurors.

13   I don't think there's been a real feeling of concern about it.

14   But any comments on that?

15       **MR. CASSMAN:**  Your Honor, it does raise a continuing

16   concern for the defense.  Obviously, we expect that it's an

17   issue that may resolve itself by July 26th.  So we're hopeful

18   there's clear guidance from the County and local authorities,

19   and so we will reserve our concerns about it to raise --

20       **THE COURT:**  Okay.

21       **MR. CASSMAN:**  -- at a later time, if necessary, which we

22   hope it's not.

23       Our major concern, which was addressed by one of our

24   in limine motions, remains with witnesses.

25       **THE COURT:**  And as I say -- and we don't know if it's a

1    problem yet, I gather.

2        **MR. CASSMAN:**  Right.

3        **THE COURT:**  So, okay.  So we'll have the hard conversation

4    when we find out the witness -- the situation and we can talk

5    it through.

6        There will be people who are not comfortable taking their

7    mask off.  And I don't know that you want to require a witness

8    to take their mask off if they say, "I don't want to be in a

9    room full of strangers without my mask."  Those are all issues

10    we'll have to address when we have an individual.

11        I don't have any indication that you have witnesses who

12    must travel but are reluctant to travel.  Maybe you don't have

13    witnesses who are traveling.  In my last trial, that was a big

14    deal.  But since there are no motions to quash trial subpoenas

15    or anything, I'll assume that we're clear sailing on that issue

16    right now.

17        **MR. CASSMAN:**  Your Honor, may I?

18        **THE COURT:**  Yes.

19        **MR. CASSMAN:**  There arose last night a potential issue for

20    the defense.  We have a witness, maybe more than one, who

21    actually is in China, Mainland China.  And we were informed

22    last night that should he come to the United States, he will be

23    required to quarantine for 28 days --

24        **THE COURT:**  Wow.

25        **MR. CASSMAN:**  -- in Beijing.

1        So he said to us, "Is there any possibility of a Rule 15

2   deposition video?"

3        And so we'll raise that with the Government and see if we

4   can work something out.

5        **THE COURT:**  Okay.  I suppose there's also remote

6   testimony.

7        Can we project one person on Zoom in the courtroom?

8        **THE CLERK:**  Yes, Your Honor.  I believe we -- yes, we have

9   the capability of doing it.  So hopefully, it will work.  But

10  we've done it before in other trials.

11       **THE COURT:**  Okay.  So, Mr. Cassman, that might be another

12  option to a Rule 15 deposition.  And, of course, the witness

13  would just have to set an alarm to be on our schedule.

14       **MR. CASSMAN:**  That's right.

15       **THE COURT:**  So that's a small price compared to 28 days of

16  quarantine, however.

17       **MR. CASSMAN:**  Exactly.

18       **THE COURT:**  Okay.  I'm going to leave --

19       **MR. CASSMAN:**  It was his suggestion, obviously.  He would

20  very much prefer not to have to do that.

21       **THE COURT:**  I'm going to leave it to you to talk.  If

22  there's an objection or if you can't work it out, we'll come

23  back.  But thank you for alerting me to that.

24       **MR. CASSMAN:**  Okay.

25       **THE COURT:**  Okay.

1       **THE CLERK:**  Your Honor, just briefly.

2       **THE COURT:**  Yes.

3       **THE CLERK:**  At the point we understand that that's going

4  to happen, I would just ask counsel to notify us ahead of time

5  and probably set up a trial run.

6       **THE COURT:**  With the witness, yes.

7       **THE CLERK:**  Yes.

8       **THE COURT:**  Definitely.

9       **THE CLERK:**  Because it's international, I'm not sure what

10  could happen that would throw any wrenches into the mix.  So I

11  would just prefer to do a trial run beforehand.

12       **THE COURT:**  Excellent.

13       **MR. CASSMAN:**  Absolutely.

14       **THE COURT:**  Excellent.  That's great.  Those are good

15  suggestions.  Thank you.

16       We are no longer requiring social distancing, but with the

17  jurors -- so in our trials up until now, we've spread the

18  jurors throughout the courtroom.  They filled all the -- in a

19  criminal trial, they fill to the back row.  I know that the

20  defense has raised a concern about that.  It's a legitimate

21  concern.  The distances are far.

22       I will invite as many jurors who are comfortable sitting

23  in the jury box to sit there.  For those who feel it's too

24  close, I will give them a space in the audience.  I probably

25  won't adhere to 6 feet, but we'll see whether any of them want

1     that.  But I don't know what they'll want to do.  But, again, I

2     feel I need to respect the jurors.  And I don't actually think

3     any of you wants a juror who's sitting here distracted by

4     whether they're getting sick because I forced them to sit next

5     to each other.  Let's see how it goes.  I think it should be

6     fine.

7          In terms of -- the public will be able to have access to

8     the courtroom.  And when we ultimately know how many jurors are

9     sitting in the audience -- now, that courtroom is flipped, but

10    I would probably reserve one side of the courtroom for jurors

11    and the other side for the parties, anyone who is coming with

12    them to observe the trial, the public, press, whoever else is

13    here, just to keep a separation.  But it just depends on our

14    numbers.  But if I have half the courtroom for others, that

15    should work.

16         And it may be that during trial, that your clients

17    actually sit in front of the bar.  Today there's no need to be

18    on top of each other.

19         **MR. OLMOS:**  Your Honor, can I ask a --

20         **THE COURT:**  Yes.

21         **MR. OLMOS:**  -- question on that?

22         Does the Court anticipate that the trial will still be

23    available by audio to members of the public who don't want to

24    come into the courtroom?

25         **THE COURT:**  I don't know whether we're going to be doing

 1   that once we open our doors.  I don't know the answer to that.

 2   It's a lot of technology going on, and I'm not sure.

 3        Is that something you want or that you don't want?

 4        **MR. OLMOS:**  I had anticipated it would be a possibility

 5   and was hoping that it would be a possibility.  But I don't --

 6   if it's not, I'm not going to ask the Court to move any

 7   mountains to make it happen.

 8        **THE COURT:**  Okay.

 9        Okay.  The one thing --

10        **MR. ROTH:**  Your Honor?

11        **THE COURT:**  -- that I -- because -- so, yes, Mr. Roth.

12        **MR. ROTH:**  I'm sorry, Your Honor.  Jerry Roth on behalf of

13   Applied.

14        So I take it that the Applied representatives can come in

15   the courtroom.

16        **THE COURT:**  Absolutely.

17        **MR. ROTH:**  Okay.

18        **THE COURT:**  I was just getting to the one limitation, and

19   it may not be a problem.

20        During jury selection, we are increasing the number of

21   jurors in the courtroom from 20 at a time to 50.  So it's going

22   to feel more like a regular voir dire.  And I actually doubt

23   that we'll have 50.

24        So let me just -- I'm going to jump ahead for a moment

25   just so that I can give you the full picture of this.

1      We will bring 50 jurors in in a group.  They will go to

2  our jury assembly room.  That will be the Friday morning.  For

3  that group, I will give them hardship questions first.  And

4  those I excuse on hardship, we're done with.  You don't have to

5  bother with their questionnaire or anything.

6      **MR. CASSMAN:**  May the parties be present for that session?

7      **THE COURT:**  I do it in writing.

8      **MR. CASSMAN:**  Oh.

9      **THE COURT:**  So you can see what they write.  And,

10  absolutely.

11      So the way I do hardship, I have a single question that

12  lists the typical grounds for hardship.  They fill it out.

13  Most of them will.  They get sent up to me.  You know what I

14  know.  I sort them; grant/deny; and then I let you look at

15  them.  And if there's anyone in the group that I would let go

16  that you want to keep, I do.  We just keep them.  I still

17  reserve the right to excuse them for hardship, but I let you

18  question them.

19      And my experience is that it is the rare circumstance

20  where a lawyer wants to keep someone who says, "I'll get

21  evicted if I can't work" or "I'm a full-time student and I'll

22  lose my semester" or "I've got three kids at home."  That's

23  what we're going to see.

24      But I'm not going to excuse them on the paper if one of

25  you wants to keep them, but I'll have their form right in front

1    of me throughout the voir dire.

2         So on Monday morning, it actually would be my hope that we

3    could get 50 people in.  I -- so you -- it will be a full

4    courtroom.

5         So getting back, Mr. Roth.  Sorry.  That was a long way --

6         **MR. ROTH:**  That's okay.

7         **THE COURT:**  For jury selection, when the courtroom is that

8    full, all the parties and Applied Materials' representatives

9    must sit in front of the bar.  You cannot mingle with the jury.

10        And so that may -- I don't know where -- I mean, if

11   there's really the public or the press, I don't regulate them.

12   But they'll be -- and it may be that that's the one day that we

13   do audio so that I can close the courtroom to visitors, as it

14   were, because it's going to be pretty full.  And so that's

15   probably what we'll do just for that voir dire, is that we'll

16   do it by audio.

17        When there are 50 people in the courtroom, it's hard to

18   know who's a juror and who isn't.  And I don't want them

19   sitting next to someone associated with your side who's a nice

20   person and who smiles at them and then becomes a witness on the

21   witness stand.  So that's front of the bar, cheek to jowl.

22   It's not really my concern.  Or tell people to not come for

23   jury selection.  It's the only time.

24        And we actually -- and then we line the jurors up the

25   normal way.  They each have their juror number.  I put 12 in

1    the box.  And then we do groups of -- rows of six and six,

2    because my mind works in groups of six when I pick a jury.  So

3    that's how we do it.

4        Okay.  So, let's see.

5        **MR. CASSMAN:**  Your Honor?

6        **THE COURT:**  Yes.

7        **MR. CASSMAN:**  I apologize for --

8        **THE COURT:**  No, no.  It's the time to get all the

9    questions answered.

10       **MR. CASSMAN:**  Perfect.

11       Backing up, and I don't know if the Court was going to

12   reach this in a minute, but you mentioned the procedures for

13   the jurors perhaps sitting out in the audience.  And, again, in

14   our motion, we raised concerns about that, which we can table

15   and address later, if necessary.  Hopefully not.

16       But it would raise an additional concern, and that is the

17   sealed documents, the AEO documents that are -- the proposal is

18   that they be shown only to the jury and to court personnel and

19   attorneys, but not to the audience.  And so I'm wondering how

20   that could work if we have jurors seated in the audience.

21       **THE COURT:**  That's a good question.  H'm.

22       It may be that we arrange a computer screen that those

23   jurors can view, because the big -- we're not going to project

24   on the big screens.

25       I have some concern about counsel screens, as to whether

1    they can be seen by people sitting behind you.  So you'll need

2    to think about that and how you're going to present it.

3        We also -- another thing is for the sealed documents, that

4    we can just have paper copies for the jurors in the audience.

5    That might be the best thing to do.

6        **MR. CASSMAN:**  That would make sense.

7        **THE COURT:**  Let's do that.  You'll know on Day One how

8    many jurors are sitting in the audience, and then you can have

9    copies.  Let's do that.  I think that's the best thing.

10       And, Mr. Nedrow, are there going to be a lot of sealed

11   documents?

12       **MR. NEDROW:**  Your Honor, there will be a number when it

13   comes to certain categories of evidence, but they're going to

14   be similar in nature.  And I think once, as the Court suggests,

15   we establish a protocol for them, we'll fall into a rhythm of

16   it, and I don't think it'll be difficult for us to have a good

17   pattern on that.

18       **THE COURT:**  Great.  Okay.  We used to do it with paper,

19   didn't we?

20       **MR. NEDROW:**  Yeah, absolutely.  Yes, yes.

21       **THE COURT:**  All right.  So normally, when I use a

22   questionnaire, I do the hardship when they're in the jury

23   assembly room and they know nothing about the case, because I

24   only want to know about them; I don't want to know their views

25   on the case.  It's pure hardship.

```
 1          Then normally what I do is I bring them into the courtroom

 2     for the questionnaire.  I go over some of the initial

 3     admonitions of not doing research or investigation, not talking

 4     to anyone.  I read to them what I call a neutral statement of

 5     the case to give them some context for the questionnaire, and

 6     then we all -- and I just introduce you.  I don't introduce

 7     your clients.  I want them to know who's sitting here.  And

 8     then we leave the courtroom, and they fill out the

 9     questionnaire.

10          I'll be bringing in -- I believe with a trial of this

11     length, that I need 120 jurors to come in on that Friday.  I'm

12     very generous with hardship.  I excuse as much as half my jury

13     panel on hardship requests.  And knock on wood.  I've never had

14     to use an alternate juror due to something about the juror.

15     Some of them misbehave in the jury room or something, but I'm

16     not losing them because all of a sudden the baby got sick or

17     "I didn't know I was really on a jury," all the things you've

18     seen over the years.

19          So that's my philosophy.  Many judges are very different.

20     They feel it's a civic obligation and there are no excuses.  I

21     just look at it differently.  But we'll see how that goes.

22          So I don't have a neutral statement from you.  If I don't

23     have one, I have to read the indictment.  I hope I don't have

24     to read the indictment, but I'm glad to.  Were you going to

25     prepare something that can be read to the jury?
```

1      **MS. KNIGHT:**  Yes, Your Honor.

2      **THE COURT:**  Ms. Knight?

3      **MS. KNIGHT:**  We'll work with the defense to come up with a

4  neutral statement and submit it to the Court.

5      **MR. CASSMAN:**  Yes, Your Honor.

6      **THE COURT:**  Good.  I'm really glad about that.  I like to

7  read it before they fill out the questionnaire.  And then often

8  it goes -- it's part of the jury instructions as well.

9      I noted --

10     **MR. CASSMAN:**  Sure.

11     **THE COURT:**  I looked at your jury instructions and you

12  didn't have it.  So when can you get that to me?

13     **MR. CASSMAN:**  Could we have ten days, Your Honor?

14     **THE COURT:**  Sure.  Okay.  So that would be -- how about

15  July 9?

16     **MS. KNIGHT:**  That's fine with the Government, Your Honor.

17  Thank you.

18     **MR. CASSMAN:**  That's fine, Your Honor.

19     **THE COURT:**  Good.

20     Do you anticipate that the indictment will be provided to

21  the jury?

22     **MS. KNIGHT:**  Your Honor, our preference is the indictment

23  not be provided to the jury.

24     **MR. CASSMAN:**  We join that request.

25     **THE COURT:**  Good.  And I will grant that request.  That

1    then avoids the issue of the word that I ordered to be stricken

2    from the superseding indictment.  So, good.

3         And I noted in your verdict forms that you have recited

4    the text of each of the charges in the verdict form to direct

5    them.  So that works.

6         Okay.  All right.  In terms of exhibits, please work with

7    Tiffany about marking the exhibits.  Only numbers, not letters.

8    It's pretty typical, again.  And I'll just leave that with you.

9    I do need backup paper copies of everything.  Our technology

10   has failed at times, and so we'll just have backups for

11   everything.

12        In terms of the jury selection -- so let me go back just

13   to the way I see the numbers.  I think it's reasonable that we

14   may need to do an oral voir dire with as many as 60 jurors.

15   That's why I'm asking for 120, so that I have the latitude to

16   grant hardships without restriction and that we don't need to

17   call in another panel later.  That's always my goal.  If I

18   grant fewer hardships, then that's fine.  No harm there.

19        Then I'm leaving, actually, a lot of room for cause

20   challenges, not that I think there will be.  But frankly, I

21   don't know -- well, Mr. Nedrow and Ms. Knight have tried many

22   cases here; but I don't know, among defense counsel, how many

23   cases you've tried and how familiar you are with our jury

24   panels.  Mr. Funk is probably very familiar.

25        I've had as many as four Ph.D. scientists on one jury.  So

it's actually a very different group of jurors than you might
see in Oakland and San Francisco.  And among those who haven't
achieved their Ph.D., many of them work in the tech industry,
because that's what we do down here.  So that's really the kind
of jury that we typically have.  Whether that's the jury that
makes it through your peremptories is another matter, but
that's not my concern.

I know that you've raised the issue in in limine about
adding peremptory challenges.  I thought that the defense
request for an additional three was reasonable.  I don't like
to grant more because it takes so much time and so many people.
But frankly, the most I'd restrict it would be to two, and that
seemed a little bit petty.  So with the Government's request to
add three on your side as well, I couldn't think of a good
reason to deny it.  So I won't.

So, again, for me, it's all about the numbers.  And
I think that it's appropriate to have three alternates.  I
typically only have two.  Again, I'm just trying to give us a
little insurance on getting the case all the way to verdict.
So an extra alternate helps that.  Again, in my last monthlong
trial, I didn't need any of them, so I had to send them home
without deliberating.  But that's always a good feeling.

So my math on the size of the panel with three alternates
and the added peremptories is that we need 41 jurors to pass
cause challenge.  You all can go home and check my math.   12

1    jurors, three alternates, 13 peremptories for the defense, and

2    nine for the Government.  I added it up to 41.  If I made a

3    mistake, please correct me.  You don't have to do that now.

4    And that's why my estimate was 60 jurors who would have passed

5    the hardship.

6         Now, you will excuse some based on the questionnaire, and

7    that's the point of it, is to move this along.  But I still

8    think having 20 to 25 extra jurors for cause is ample.  It's

9    rare to have that many people that biased that they can't sit

10   on a jury.

11        So I think -- does anyone feel differently about the

12   numbers?  You're all so experienced.

13        **MS. KNIGHT:**  No.

14        **MR. NEDROW:**  No.

15        **THE COURT:**  I want to benefit from your experience.

16        **MR. CASSMAN:**  That sounds appropriate, Your Honor.

17        **THE COURT:**  Okay.  All right.

18        **MS. KNIGHT:**  Your Honor, that seems fine with us too.

19        **THE COURT:**  Thank you.  Good.

20        **MR. CASSMAN:**  But we will check your math.

21                         (Laughter.)

22        **THE COURT:**  Okay.  So I'm going to turn to the

23   questionnaire in just a minute, but let me just tell you.  So

24   on the Friday we will all have, by the end of the day, the

25   filled-out questionnaires.  And just make a note.  I will

1    expect an e-mail from -- a joint e-mail from all of you by noon

2    on that Sunday, the 25th, with a list of any jurors you all

3    agree should be excused for cause.  If you don't agree, I don't

4    want to know about it.  It just doesn't matter to me.

5        I will then look at the questionnaire, and if I agree with

6    you that there's grounds for cause, we don't even need them to

7    come in.  And that just saves -- again, it's just a courtesy to

8    the jurors.

9        I would expect and hope that there would be several that

10   would jump out and you would excuse them, and they tend to be

11   people who can kind of muck up the -- I mean, if it's that

12   clear on a questionnaire, they kind of muck up the oral

13   voir dire and can be a little bit of a problem.  So that's my

14   hope.

15       And you just send me an e-mail.  Tiffany's on call.  And

16   they get phone calls on Sunday afternoon, those few that can be

17   excused.

18       And so we'll bring in 50 out of that group for a first

19   tranche, and then we will bring in the rest after that.  If we

20   meet our magic number of 41 with the first group, we're done.

21   You go right into peremptory.  And that's why I want you to be

22   ready with your opening statements, and the Government will

23   have to have witnesses, on Monday.

24       So I do time limits for the oral voir dire, but I don't

25   really -- I can't really envision how you're going to handle

1   that with four co-defendants.  You will have -- the only reason

2   I do a questionnaire is to reduce the time of the oral

3   voir dire.  Otherwise, it wastes all of our time.

4       So it seemed to me that for the group of 50, that

5   30 minutes of oral voir dire was adequate for each side.  And I

6   wanted to hear from you.  I will have my stopwatch going.

7       Mr. Nedrow?

8       **MR. NEDROW:**  Your Honor, from the Government's

9   perspective, we think 30 minutes is fine.  Thank you,

10  Your Honor.

11      **THE COURT:**  Okay.

12      **MR. FUNK:**  From the defense side, we were thinking more

13  along the lines of 40, which gives ten minutes per defendant.

14  We may not all use our ten minutes.  But in the off chance that

15  we do, we'd rather have a stopwatch at 40 than 30.

16      **MR. NEDROW:**  Your Honor, the extra ten minutes is fine.

17  And I guess we'll ask for 40 as well.  I really don't think

18  we'd use it.  So I hope it's okay if we don't use all of it,

19  but if we have --

20      **THE COURT:**  It would be a pleasure.  You'd have a smile on

21  my face if you didn't use it.

22      **MR. NEDROW:**  Thank you.

23      **THE COURT:**  Plus all the jurors.

24      I'll allow the 40, Mr. Funk.  That's a reasonable request.

25      So for the -- and then we do it all over again if we need

1  another panel.  That's all.  It is what it is.

2      For the peremptories, typically, the lawyers have the

3  jurors outside of the courtroom and you pass the sheet back and

4  forth.  Is that acceptable?  I'm glad to have the jurors

5  sitting here but --

6      **MR. NEDROW:**  Yes, Your Honor.  There are times, just given

7  the number of people, where -- and the parties will be

8  discreet -- we've had them sit while we pass it.  We kind of

9  cover up the paper.  But we're also happy to do it with the

10  jurors outside the courtroom.

11      We defer to the Court on it from our perspective.

12      **THE COURT:**  Okay.  So what I would --

13      **MR. NEDROW:**  Whatever's easiest.

14      **THE COURT:**  So what I would do, if you don't need to look

15  at the jurors, we'd go into the jury room and then -- I mean,

16  they'd sit here.  We'd go into -- give them a break.  We give

17  them, like, a half-hour break.  And then you pass the page back

18  and forth, and then I just confirm that I've got it right, and

19  then we have a jury.  That works?

20      **MR. CASSMAN:**  It's our preference not to do it in the

21  presence of the jury.

22      **THE COURT:**  Good.

23      **MR. NEDROW:**  That's fine.

24      **MR. CASSMAN:**  However that is accomplished.

25      **THE COURT:**  That works.  Good.  Okay.

1    Then, in terms of -- although I can't regulate your time

2  for putting on your case, I do regulate your opening and

3  closing statements.  And so I am -- I certainly understand that

4  each of you will want to make an opening and closing statement

5  and that'll be important, but I don't want the jury to have to

6  sit here for three hours while you're doing it.

7    So did you have a proposal for opening for the defense?

8    **MR. CASSMAN:**  On behalf of defendant Chen, Your Honor, we

9  would request 30 minutes.

10    **MR. ALTSCHULER:**  Your Honor, for Mr. Olgado, we would

11  request 20 minutes.

12    **MR. OLMOS:**  On behalf of Mr. Hsu, 15 minutes, Your Honor.

13    **THE COURT:**  Mr. Funk, you see the trend here.

14    **MR. FUNK:**  On behalf of Mr. Ewald, I believe I can get it

15  done in 15, Your Honor.

16    **THE COURT:**  Okay.  Well, Ms. Knight, I can't really cut

17  you down below the hour and 20 minutes that they want.

18    **MS. KNIGHT:**  We'll do an hour and 20 minutes, Your Honor,

19  with the anticipation that we might not use the entire time.

20    **THE COURT:**  Yeah.  Okay.  So I'm going to make -- if I did

21  that math right, that was an hour and 20 minutes.  I will not

22  apportion it.  I'm going to leave that to you.  So if

23  Mr. Cassman goes over, then he has only -- his colleagues here

24  will be stepping on his feet.  But I'm not going to cut

25  Mr. Cassman off so that Mr. Altschuler can have all of his

1    time.  I'm just going to run the clock.  Okay?

2        Get your hook out, Mr. Altschuler.

3        **MR. ALTSCHULER:**  Thank you, Your Honor.

4        **MR. FUNK:**  Well, I don't know about that because I think

5    I'm last.  So --

6        **THE COURT:**  Like I said, get your hook out.

7        **MR. FUNK:**  All right.

8        **THE COURT:**  Okay.  That's fine.  It's a long time for the

9    jury to sit.

10        And then, for closing, again, I look to the defendants,

11    because the Government would never want as much as your

12    composite.

13        **MR. CASSMAN:**  You're starting with us again.

14        Well, it's really difficult at this stage to know.  I can

15    give you an estimate of an hour, but I'm hoping the Court won't

16    hold us to that at this time.  I think I'm reasonably confident

17    we'll be able to do it in an hour.

18        **THE COURT:**  Well, I'm going to hold you to what I decide.

19        **MR. CASSMAN:**  Okay.

20        **THE COURT:**  So, Mr. Altschuler, what's your estimate?

21        **MR. ALTSCHULER:**  An hour as well, Your Honor.

22        **THE COURT:**  Mr. Olmos?

23        **MR. OLMOS:**  You know, Your Honor, without -- I think my

24    preference would be to defer this decision; but if we can't

25    defer it now, I'm going to have to ask for an hour too.

1    **MR. FUNK:**  Well, at this time I'm going to ask for an hour

2    as well.

3    **THE COURT:**  I'm going to have the jury be here longer,

4    because we're going to have a whole day of closing argument.

5    And I think that's unreasonable.  I think it's unreasonable,

6    and I think you'll lose your jury.

7    That would be -- well, I don't expect that the Government

8    would spend four hours in closing argument.

9    **MR. NEDROW:**  We're not going to say four hours.

10    **THE COURT:**  On a three-week case.

11    **MR. NEDROW:**  I think we would like to say, as we

12    understand it now, two.  And we feel comfortable with two.

13    Thank you.

14    **THE COURT:**  Okay.

15    **MR. NEDROW:**  Oh, and I should note, if I may ask,

16    Your Honor -- I apologize -- that'd be two on the closing.

17    **THE COURT:**  On the closing.

18    **MR. NEDROW:**  So, yes.

19    **THE COURT:**  Including your rebuttal in closing.

20    **MR. NEDROW:**  Oh, so you're including --

21    **THE COURT:**  Two, total.

22    **MR. NEDROW:**  This estimate, you're including rebuttal in

23    it?

24    **THE COURT:**  Oh, yeah.

25    **MR. NEDROW:**  Okay.

1    **THE COURT:**  It's up to you to reserve.

2    **MR. NEDROW:**  Then I would ask, please, for two and a half;

3    two hours for the closing and a half hour for rebuttal, please.

4    **THE COURT:**  I think these are extraordinarily long periods

5    of time.  I will approve it, and I will enforce it strictly.

6    So as you start practicing, you can start timing.  But I will

7    grant you the request that you're making, and as I say, it will

8    be strictly enforced.

9    Okay.  The last thing, before we go to the questionnaire,

10   is that I like to have the jury instructions and verdict form

11   done before opening statements.  I recognize we all have to get

12   together right before the jury is charged to look them over.

13   But we've made our notes.  It's just a late check to make sure

14   everything went in the way we expected.

15   So, I mean, the nice thing is, you know what case you're

16   trying.  It's sort of hard to try a case and then find out the

17   judge didn't agree with you.  So I don't like to do that.

18   Plus, we're all too tired to do it at the end.

19   So I would like you to reserve July 22nd at 2:30 in the

20   afternoon for the jury instruction/verdict form conference.

21   That, again, will be in person here.  I don't know what

22   courtroom I'll be in; so it'll be a surprise for all of us.  It

23   may be in my own courtroom by then.  And I will be in the

24   middle of a trial that week, but not that day.  And I do have a

25   series of motions at 1:30, but I think I can easily be done by

1    2:30.  And you can expect that'll take a couple of hours,

2    although there weren't many in dispute.

3        **MR. CASSMAN:**  No.

4        **THE COURT:**  I did notice that.  I was happy about that.  I

5    haven't read them.

6        **MR. CASSMAN:**  Oh.

7        **THE COURT:**  I just -- I'm sorry.  I just looked at them at

8    a high level to get a sense of how much work it would be.  And

9    on the verdict form, my only comment was formatting.  So,

10   again, that was because it looked like you had agreed on that.

11       **MR. CASSMAN:**  Your Honor, with regard to the conference on

12   the 22nd at 2:30, may the clients be excused?

13       **THE COURT:**  Oh, yes.  Absolutely.  Absolutely.

14       All right.  Let's turn to the questionnaire.  So I like

15   questionnaires.  I certainly understand the need to address

16   some sensitive issues in writing so that people feel maybe more

17   comfortable being candid, and that's important.  I also think

18   it saves a lot of time and helps you direct your questioning.

19       I see the Government's objections.  What I'd like you to

20   do -- I hope that you have a copy of it with you.  And I'd like

21   to go over it from top to bottom.

22       Who will take charge of presenting me with a clean copy?

23   I don't know who has this --

24       **MR. CASSMAN:**  You mean later?

25       **THE COURT:**  I'm going to modify this.

1          **MR. CASSMAN:**  Right.

2          **THE COURT:**  And someone needs to revise it.

3          **MR. CASSMAN:**  We'd be pleased to do that, Your Honor.

4          **THE COURT:**  Thank you.

5          All right.  So, first of all, what the Court is now doing

6    is sending out -- we do it in a SurveyMonkey format -- a basic

7    questionnaire:  name, rank, and serial number.  And it's

8    about a dozen questions.

9          The questions are:  Name, age, city or town, how long

10   you've lived there.  Where were you born?  What is your current

11   employment status?  Your occupation?  Who's your employer?  How

12   long have you worked there?  What's your education level?

13         It asks marital status, although I don't generally -- I'm

14   going to try to get that one taken off.

15         It asks, if you have children, list their occupations.

16   And I generally take that off.

17         And it asks if other adults live in your household, what

18   work do they do.

19         It then asks the jury, have you served on a jury before?

20         And it does ask if a person -- if a juror is fully

21   vaccinated; but they have three choices:  "yes," "No," and

22   "Decline to state."

23         Many jurors put in "Decline to state."  So we just presume

24   they're not vaccinated, because that's fine.  You will have

25   that information, though.  I don't know what I'll do with it.

1    I mean, I -- but it is what it is.

2         So I mention that to you because I'm going to cut some

3    questions out of your questionnaire because you will have that

4    information.  You can just staple it on.  And people don't like

5    to be asked the same question twice.  So --

6         **MR. FUNK:**  Your Honor, is there a copy of that?  I know

7    the Court was reading it, and I was trying to keep up, but I

8    don't write that fast.

9         **THE COURT:**  So I had to copy the one from my last trial,

10   and it has the answers on it.

11        **MR. FUNK:**  Okay.

12        **THE COURT:**  If we can get you a copy, we'll try to send it

13   to you.  Okay?  But it's really the basic.

14        **MR. CASSMAN:**  That's great.  We'd like to see it.

15        **THE COURT:**  Okay.  I don't actually have a copy of it, but

16   I'll see what I can do.

17        Okay.  Do you have it, Tiffany?

18        **THE CLERK:**  No, Your Honor, but I can --

19        **THE COURT:**  Oh, that'd be great.  Okay.

20        And then, before you leave, if you give Tiffany e-mail

21   addresses, she can just send it to you.

22        So on this questionnaire, I certainly would retain the

23   juror's name, but then I would delete 1 and 2 as already asked,

24   and that would include age and place of birth on Number 1

25   because it's already asked.

 1          Number 3 is not on the form, but I would delete it

 2     because, once you know their city, you can Google it and find

 3     out what county they're in.  I'm just trying to keep this

 4     shorter.  And then the "I don't live in any of these counties"

 5     would come out as well.

 6          4 is -- let's see.  If I don't mention a number, then it's

 7     fine.

 8          Number 6, I would delete.

 9          Number 7 is generally -- in terms of whether they

10     understand English to sit as a juror is on my hardship, and

11     it's on the questionnaire the Court sends.  So I would delete

12     Number 7.

13          Number 8 is already asked in the basic questionnaire of

14     what's your employment.

15          And then I'm going to skip down to, Number 11 would be

16     deleted.

17          Now, Number 13 was objected to by the Government.  What

18     was the nature of your objection?

19          **MS. KNIGHT:**  Your Honor, we just believe that it just

20     takes up too much space on the questionnaire; that we can

21     gather information once we voir dire the jurors themselves.  We

22     just thought it was just unnecessary.

23          **THE COURT:**  It's a lot of little boxes, I will say.

24          **MR. CASSMAN:**  We think it provides important insight for

25     the defense, Your Honor, and presumably for the Government as

1  well.

2      **THE COURT:**  All right.  I will allow it.

3      The next page is fine.

4      Number 21, I would delete.

5      Now, let me tell you that with the deleted questions, you

6  are free to ask these questions orally.  I'm not -- I don't ask

7  them, and I actually consider most of them offensive.  But,

8  you know, as long as it's not coming from me, you're free to

9  offend any juror you want.  So it's your decision.

10     Number 22 I actually thought was overbroad to get any kind

11 of answer.  Attorneys, judges, district attorneys, police

12 officers, other law enforcement, anyone who works in the legal

13 profession or is court personnel.  It's just too broad.  So

14 what do you really want there?  I mean, I would take out, after

15 the word "law enforcement officers," the "or anyone else" to

16 the end, I would exclude.

17     **MR. CASSMAN:**  That's fine.

18     **THE COURT:**  Okay.

19     **MS. KNIGHT:**  That's fine with the Government, Your Honor.

20     **THE COURT:**  Thank you.

21     Number 30, the Government objects to.  The nature of your

22 objection?

23     **MS. KNIGHT:**  Your Honor, we object to this question.  This

24 is not a case about unfair competition.  We just believe it's

25 inappropriate to have on this questionnaire.

1    **MR. OLMOS:**  Well, Your Honor, I think that it is actually

2   sort of the gravamen of the case.  It's how the Government has

3   presented this case, both publicly and in this courtroom, is

4   that this was a start-up company that was being initiated by

5   the defendants and that they were using stolen intellectual

6   property.  And I think that if jurors have had similar

7   experiences or at least have perceived that they have had

8   similar experiences, that's important to us.

9    **THE COURT:**  Okay.  I'll allow it.

10    Number 33.  So I have a comment about Number 33.  I don't

11   actually object to the question so much as I laughed out loud

12   when I compared it to your expert who wants to opine that this

13   is exactly what happens.

14    I consider your expert racist in those opinions, and I

15   will be, unless you persuade me otherwise, probably excluding

16   that expert.  But you can't have it both ways.

17    (Reading):

18        "Do you believe that Chinese companies gain

19        unfair advantage over American enterprise by gaining

20        access to misappropriated" --

21    I don't know what the purpose of this question is.  If

22   someone says "yes," does that mean that they have a racist

23   view?

24    **MR. OLMOS:**  Your Honor, I think that we were -- I hoped

25   that we were --

1     (Court reporter interrupts for clarification of the record.)

2          **THE COURT:**  You can sit.  I know it's hard, Mr. Olmos.

3          **MR. OLMOS:**  We were careful, Your Honor, and perhaps not

4     careful enough, to couch this, both the question and, I think,

5     our expert disclosure -- and we have to get into that --

6          **THE COURT:**  We haven't done at --

7          **MR. OLMOS:**  -- at length.

8          **THE COURT:**  -- the in limine, yeah.

9          **MR. OLMOS:**  This is referring to Chinese companies, not

10    Chinese people; that companies in China, because of their

11    unique relationship to -- between Chinese enterprise and the

12    government in China, that is what the nature of the stories

13    that we're concerned about have been.

14          That is the basis, Your Honor, of -- again, we can get

15    into the expert later and some of the things that the expert --

16    the information that our expert has relied upon, including

17    presidential memoranda from President Obama.

18          The Government -- Your Honor, we understand why

19    the Government is objecting.  But we want to be very careful

20    here, Your Honor, about putting a box around this is the

21    Chinese government and Chinese companies, companies based in

22    China, and how those entities interact.  And without regard to,

23    you know, somebody's ethnicity or how they might otherwise be

24    predisposed because of who they are, what they look like, or

25    where they're from.  This is unique to how Chinese enterprises

1    interact with the Chinese government.

2        **THE COURT:**  So that is far too complex to actually -- and

3    nuanced to be reflected in any answer you'd get to this

4    question.  And so I'm not going to allow it because I think

5    you're going to get too many false positives on it and not know

6    what you're getting.  Again, I'm not excluding you from asking

7    the question.  It's just whether it's on the questionnaire.

8    And that was a very nuanced answer, and this question just

9    doesn't capture it.

10       **MR. OLMOS:**  Understood.

11       **THE COURT:**  Okay.

12       **MR. CASSMAN:**  Your Honor, could I add briefly, just to ask

13   the Court to reconsider.

14       There was pretrial publicity.

15       **THE COURT:**  I understand.

16       **MR. CASSMAN:**  Actually, when the charges were filed, there

17   was a press release from the --

18       Did we bring it?

19       **MR. OLMOS:**  We did.

20       **MR. CASSMAN:**  We have a press release which very

21   explicitly referred to the Chinese government and

22   misappropriation of IP from American companies.  And so we're

23   very concerned that this is an issue that should be flagged for

24   the jurors so that we --

25       **THE COURT:**  But if a person says that "Yes, I've seen it,"

1    what does that mean to you?  See, I'm worried about false

2    positives here, false negatives.  What does it mean to you?

3    What is that telling you about a for-cause challenge?  That's

4    all I'm concerned about.  This questionnaire is not about your

5    peremptories.

6        **MR. CASSMAN:**  We're hoping that they then explain, which

7    they're asked to do, and they tell us what their thoughts are

8    about what they've read and seen.

9        **THE COURT:**  I'm not going -- you're going to have to

10   explore that orally.

11       All right.  Number 35, the Government objects to this.

12   The nature of your objection?

13       **MS. KNIGHT:**  Your Honor, we object to this question just

14   because I think it's -- this case isn't about immigration.  We

15   think jurors will start -- it will just take a lot of time for

16   jurors to respond regarding this immigration issue.  We just

17   don't think it's appropriate.

18       **THE COURT:**  I understand that some of the defendants are

19   recent immigrants themselves.  Is that correct?

20       **MR. CASSMAN:**  That's correct.

21       **THE COURT:**  It's a big question, Ms. Knight, and it can

22   open up a big box.  I certainly understand that.

23       I think I would rather get a little information from

24   jurors in writing so that if you have someone who's kind of a

25   runaway on the issue, that we might either exclude the person

1  from the jury right away.

2      In this case, I would like to avoid a tirade from a juror

3  who has very strong feelings on this, and I think this kind of

4  question might help all of us.  Okay?

5      **MS. KNIGHT:**  Okay.  We'll withdraw our objection,

6  Your Honor.  Thank you.

7      **THE COURT:**  All right.  Thank you.

8      So I will allow 35.

9      I was concerned -- so 37, 38, and 39 are important

10  questions.  I typically don't like them asked on a

11  questionnaire because most jurors don't know these things.  And

12  I don't want it to be a referendum on the Constitution as

13  opposed to them having the foundation of understanding that

14  these are our rights.

15      So, as I said, these are important questions.  I generally

16  go over them myself with the jury.  But I'm not -- what I find

17  is that sometimes jurors answer these questions one way and

18  then, once they're sitting here in jury duty, they recognize

19  that it's actually very different than they thought.

20      **MR. OLMOS:**  And, Your Honor, we actually agree with that.

21  And I think that that's why they're here, because in our

22  experience, it is very different for a juror who sees, as

23  Your Honor knows, that these three questions start with "The

24  law states."  And getting jurors' reactions to those in paper

25  form, we feel like the jurors are more candid in that way than

1  they are when a federal judge says, you know, "Mrs. Smith, this

2  is what the law is.  Do you think that you can follow that?"

3  You know, I think that you're going to get -- you're going to

4  get a more candid response when it is asked in paper form than

5  it is when it's coming from Your Honor.

6      And that was our -- you know, there are going to be

7  rehabilitative questions down the road during oral voir dire on

8  those.  But from our perspective, we do want that sort of

9  initial candid response to those questions.

10     **THE COURT:**  Well, it's a difficult question.  I don't

11  disagree with what you're saying, Mr. Olmos.  It's just a

12  matter of how to get at the best answer from jurors.

13     Well, I'll allow the questions, but I probably won't

14  excuse anyone for cause based on these answers.  And, I mean,

15  that doesn't mean you can't -- you're not waiving your

16  objection for cause, but I'll be able to hear from them before

17  I make a decision.

18     Okay.  On Question 42, I'd like to delete "health

19  problems" because we cover that elsewhere.

20     On Number 45, it says "Refer to witness list"; but you

21  have to actually print the witness list on the form.

22     And then there's another two questions that I think you

23  need to ask.  I was actually surprised they weren't here.

24  I think it's important to ask if any juror has now -- does now

25  or has in the past worked for Applied Materials.  So if you

1 would add that, please.

2  And I believe Applied Materials is a publicly held

3 company.  Is that right, Mr. Roth?

4  **MR. ROTH:**  Yes, Your Honor.

5  **THE COURT:**  So we need to ask if they currently own stock.

6 And that question -- I'll let you formulate it, but that

7 question needs to expressly state mutual funds are excluded.

8 And I don't care about past stock ownership.

9  In my view, any current stock ownership is an automatic

10 for-cause challenge.  I don't actually think federal law

11 provides that so strictly, but that's been my view.  You can

12 argue separately.  I don't think the defense would complain.

13  **MR. CASSMAN:**  We will not complain, Your Honor.  Good

14 catch.  Thank you.

15  **THE COURT:**  Okay.  So you will add those two questions and

16 fill out the witness list?

17  **MR. CASSMAN:**  We will.

18  **THE COURT:**  Okay.

19  **MR. NEDROW:**  Thank you.

20  Your Honor, should 46, may I ask, also include not just

21 individuals who worked for Applied Materials, but if they know

22 people who work for Applied Materials or are close to them?

23  **THE COURT:**  That's fine.

24  **MR. NEDROW:**  Some tangent like that.

25  **THE COURT:**  That's fine.  You or anyone close to you work

1    for --

2        **MR. NEDROW:**  Yes.

3        **THE COURT:**  Yeah.  Sure.  Glad to do that.

4        **MR. NEDROW:**  Thank you.

5        **THE COURT:**  Glad to do that.

6        **MR. FUNK:**  Your Honor, I missed Number 2.  Is that in or

7    out?

8        **THE COURT:**  Number 2 is out.

9        **MR. FUNK:**  Thank you.

10        **THE COURT:**  Again, that's because it's already been asked.

11        So if you want me to walk through this very quickly, the

12    ones that are out are 1, 2, 3, 6, 7, 8, 11, 21, 22 modified,

13    33.  45 is -- I'm sorry.  42, delete "health problems."  45,

14    add witness list.  And then add the two questions about

15    employed by Applied and currently own stock in Applied.

16        Okay.  That took a little longer than I had hoped, but

17    I think it helps us all.

18        What I would like to do next is to move on to the

19    in limine motions.

20        And just let me tell you, at 3 o'clock we're going to take

21    a break.  I don't like to go more than an hour and a half

22    without one.

23        I'm going to start with the Government's motions.

24        **THE CLERK:**  Your Honor, do you have a deadline for the

25    revised questionnaire?  Did I miss that?

1      **THE COURT:**  Can we do that on July 9 as well?

2      **MR. NEDROW:**  Yes, Your Honor.

3      **MR. CASSMAN:**  Yes, Your Honor.

4      **THE COURT:**  That'd be great.

5      So with the questionnaire, Tiffany, do you need them to

6   provide to us the copies, or do you make the copies?

7      **THE CLERK:**  I can make the copies, Your Honor.

8      **THE COURT:**  Okay.  So when you provide it -- let me go

9   back and look.

10     You don't have headers or footers on it; so that's fine.

11  You can e-mail it to Tiffany so that she can then copy it, and

12  that'll be great.

13     Okay.  Typically, I'm able to rule on in limine motions

14  from the bench and follow up with a written order.  I didn't

15  have any trouble getting through these.  That's not to say

16  there weren't some difficult issues, but that's the way I like

17  to proceed.

18     What I like to do is to read the name and number of the

19  instruction into the record so that you have a good record of

20  it and you can find things in the transcript.  And then we'll

21  go on.

22     I can give you -- and then I will ask your forbearance.

23  I've gone through each of these thoroughly, but I don't have an

24  instant recall.  So I'm going to be staring at my notes to

25  remind myself of the detail as we go along.

1    Government in Limine Motion Number 1, to exclude evidence

2    not yet produced.

3        In this one, I am inclined to grant this motion with the

4    limits suggested by the defense, to give you the leeway to

5    produce documents that come to you late so long as you can

6    justify the late disclosure.

7        **MR. CASSMAN:**  And, Your Honor, we would ask one other

8    qualification.  It is possible, and if it's justified, that we

9    determine a document that we had in our possession, we now

10   realize that we intend to use at trial, we would promptly alert

11   the Government.

12       **THE COURT:**  Well, I know everything -- the ground shifts

13   all the time.  And since I can't anticipate what that might be,

14   I'm going to have to require that you obviously show

15   the Government.  They may not have any objection.  They may

16   find that it's not prejudicial.  I won't even have to deal with

17   it.  But if so, then you're going to have to persuade me that

18   the late disclosure was justified.

19       And with that, I think I can grant this motion.

20       **MR. CASSMAN:**  That's acceptable to the defense,

21   Your Honor.

22       **THE COURT:**  Okay.

23       **MR. ALTSCHULER:**  Your Honor, may I confer with co-counsel

24   for a moment --

25       **THE COURT:**  Sure.

1          **MR. ALTSCHULER:**  -- please?

2                    (Co-counsel confer off the record.)

3          **MR. ALTSCHULER:**  Thank you, Your Honor.

4      I think it's -- I think it's our understanding that what

5  the Court order is directed to is material that is not already

6  part of the pool of discovery documents.

7          **THE COURT:**  I think that's understood.

8          **MR. ALTSCHULER:**  Okay.

9          **THE COURT:**  If the Government has the document, then

10  through whatever source they've had it, there can be no

11  prejudice.

12          **MR. ALTSCHULER:**  Thank you.

13          **THE COURT:**  Okay.  In Limine Motion Number 2 is to admit

14  self-authenticating business records from Internet service

15  providers relating to defendants' e-mail accounts.

16      There was no objection to Number 2, and I will grant it.

17      In Limine Motion Number 3 is to exclude defendants from

18  admitting self-serving hearsay.

19      So in this motion, the Government didn't -- couldn't

20  identify what those documents might be or provide me the

21  context in which they might be offered.  And so although it's

22  always nice to nail this down, I believe I have to defer on

23  this and that you'll have to object at the time.

24      So, Ms. Knight, Mr. Nedrow, any other comments on that?

25          **MS. KNIGHT:**  No, Your Honor.  Thank you.

1       **THE COURT:**  And I think that was the outcome that the

2  defense was either expecting or wishing.

3       **MR. GOLDMAN:**  Yes, Your Honor.

4       **THE COURT:**  Okay.  In Limine Motion Number 4, to exclude

5  reference to punishment in front of the jury.

6       I will grant this motion.  There was no objection.

7       In Limine Motion Number 5, to exclude character evidence.

8       I certainly -- it appears that no character evidence is

9  anticipated at this time.  And so I -- I suppose I have to, in

10  a sense, defer on this in case something comes up.  I think

11  it's mostly a grant, but I don't know if you feel more

12  comfortable with my deferring on this on the basis that there

13  is no proffered character evidence.

14       **MR. CASSMAN:**  We would ask the Court to defer, Your Honor.

15       **THE COURT:**  Okay.  Mr. Nedrow, any objection to that?

16       **MR. NEDROW:**  No objection.  Thank you, Your Honor.

17       **THE COURT:**  Okay.  Again, it'll have to be late -- if it's

18  a late disclosure, it'll have to be justified, but maybe it

19  won't -- we won't get there.

20       Okay.  In Limine Motion Number 6, to exclude certain

21  evidence and argument related to the civil case.

22       Well, we went nice and smoothly up till now.  And I know

23  this is the subject of Number 9 for the defense as well.  So I

24  spent a lot of time thinking about this.  A couple of thoughts

25  on it.

 1        We're really talking about the TRO.  And this one, is that

 2   the -- I'm trying to see what other -- I don't know that you --

 3   is the TRO itself the only document you've specified here?

 4        **MR. CASSMAN:**  No, Your Honor.  We specified three.

 5        **THE COURT:**  But what does the -- this is the Government's

 6   motion.  So what --

 7        **MR. CASSMAN:**  Oh, I'm sorry.

 8        **MS. KNIGHT:**  Your Honor, we just specified the TRO.

 9        **THE COURT:**  Just the TRO.  So I'll wait to get to yours,

10   but this one is just about the TRO, and I recognize you've

11   briefed it thoroughly on Number 9 as well.

12        So here's my concern.  I sat on the Superior Court for a

13   long time.  I know how rushed Superior Court judges are, and I

14   know that there's zero staff to help out.  So even writing a

15   two-paragraph order in the hurly-burly of the Superior Court is

16   just not possible.  So I get all of that.

17        However, there are no findings in this order.  There are a

18   lot of X marks.  And, in fact, let me -- let's see.  I think

19   it's in -- I just don't have it in front of me.

20        Yeah, here we go.  What is really concerning to me is that

21   it took me a long time to figure out what it says.

22        So I just will say that in the judge's order, it starts

23   out in the caption "Order Granting Plaintiff Applied Materials'

24   Ex Parte Application for Temporary Restraining Order."

25        So that would not be true, would it?

 1        **MR. CASSMAN:**  No.

 2        **THE COURT:**  And then it goes on.

 3        And, as I say, I have been in this judge's shoes, so it's

 4   not a criticism, but I know what to look for here.

 5        Then I have a lot of Xs.  I've got 1, TRO is denied, with

 6   initials.  2, denied, with Xs as to paragraph 2.  Lots of

 7   crossing out.  And then it goes into the evidence preservation

 8   issues, which are not really of concern.

 9        So there are -- this judge made zero findings and signed

10   an order that both said it was being granted and denied.  And

11   it would -- and I gather there was something in the transcript

12   that might have suggested that it was based on the evidence

13   presented or the state of the record.  Well, that's not saying

14   anything.  That's not a finding.  Everything's based on the

15   record presented.  So that doesn't mean anything.

16        And so I believe that this order is so confusing and

17   impenetrable and no basis for it can be gleaned, you would have

18   to make it up.  You would have to make it up.  And so I am

19   inclined not to allow the TRO to be submitted.

20        The fact of the denial is a different matter.  I'm dealing

21   with a document here, and I just -- there is no way that I

22   could even write an instruction that would tell the jury,

23   "Please disregard what the judge said in the caption."  I'm

24   sorry.  It's just -- God bless him.  He did the best -- it's

25   the way it goes.

1    And when we get to the defendants' Number 9, I think

2  that's really where we talk about, in addition to the

3  documents, what you can tell the jury.  And I think it's

4  clearly an undisputed, indisputable fact that the TRO was

5  denied.  And so we'll talk about that when we get to the other

6  motions, but I didn't want to leave that hanging at this point.

7    Mr. Nedrow, is that the only issue in this motion, is the

8  TRO itself?  That's what my note shows.

9    **MR. NEDROW:**  Yes, Your Honor, that's correct.  In this

10  motion, yes.

11    **THE COURT:**  Any comments based on my --

12    **MR. CASSMAN:**  I will reserve for defense Number 9,

13  Your Honor.

14    **THE COURT:**  Okay.  But I am excluding the TRO itself.

15    **MR. CASSMAN:**  We understand.  The fact that it was denied

16  is the fact that we want before the jury.  So we'll get to that

17  at the appropriate time.

18    **THE COURT:**  Great.  Okay.  So you have no further

19  objection on the document itself --

20    **MR. CASSMAN:**  That's correct.

21    **THE COURT:**  -- being excluded?

22    All right.  Then I will grant this, to exclude the TRO

23  order as a document.  I devoted a lot of time to that one.

24    All right.  In Limine Motion Number 7, to exclude

25  nullification argument and evidence.

1    So it appeared to me that this was not opposed at a high

2  level, but there were some things that you wanted to argue.

3  Let me get to your opposition, because I have notes on it but I

4  don't want to mischaracterize.

5    So I'm looking at the opposition, and I'm just going to go

6  through it.

7    I would not allow the defense to argue that this case

8  should have been a civil matter.  However, your whole case is

9  that the conduct of the parties didn't rise to criminal

10  conduct.  So, of course, that's the case.  But I don't think --

11  the jury may feel that this is a lot of smoke around something

12  that should have been resolved by the company with its

13  employees, but I'm not going to -- I don't think -- I'm not

14  going to allow you to argue it.

15    And then, that Applied sought criminal charges to enhance

16  its position in the civil case.

17    **MR. CASSMAN:**  Your Honor, we would submit that's an

18  entirely appropriate argument.

19    **THE COURT:**  But I don't think -- maybe it's just a nuance

20  or a lack of my understanding here.  A victim's motives,

21  I think, are never relevant to a criminal prosecution.  I mean,

22  I might be the victim of a violent crime and not report it

23  because I'm scared, but the district attorney may prosecute

24  anyway.  My motives are not relevant.

25    In a case like this, I'm sure there are many -- the fact

1   that Applied thought it could enhance its civil case, I just

2   don't think that -- I just don't think it's relevant.

3       But I recognize, though, that the issue of impeaching a

4   witness's testimony -- and that's where this would live, is in

5   impeachment only, in my view.  And that's where I'm struggling

6   with -- I don't know that everything would be excluded, but I

7   would be inclined to allow you to impeach the truthfulness of a

8   witness's testimony or the credibility of it based on their

9   ulterior motive, personal motive.  That's the basis of

10   impeachment.  I have no problem with that.

11       The way this is written is that Applied sought criminal

12   charges to enhance its position in the civil case.

13       **MR. GOLDMAN:**  Your Honor, Raphael Goldman.  Can I be

14   heard?

15       **THE COURT:**  Yeah.  There you are.  Sorry.

16       **MR. GOLDMAN:**  Sorry.  That's okay.  This is my first time

17   appearing in person before you.  Pleased to meet you.

18       **THE COURT:**  Good to meet you.

19       **MR. GOLDMAN:**  So I think there's a couple issues here.

20   One relevant issue is the Government's investigation.

21       **THE COURT:**  Yes.

22       **MR. GOLDMAN:**  And the intertwining between Applied

23   Materials and the Government's investigation is quite relevant.

24   It's a proper basis for attacking the Government's case.

25       And then there's also the issue of current and former

1    Applied witnesses who may or may not be biased by the fact that

2    they need to go back and keep working and the company is going

3    to be interested in how they testified and whether they helped

4    the company out in the pending civil litigation.

5         So for sure, we hope to impeach witnesses with this.

6         **THE COURT:**  Absolutely.

7         **MR. GOLDMAN:**  But there's also the entirely proper defense

8    presentation about the good faith or motivation of

9    the Government's own investigation, the extent to which it was

10   improperly or overmotivated by a local large company becoming

11   involved with them.  And I think that's very fair game for the

12   defense, and we ought to be able to use that in our

13   cross-examinations and, really, any presentation.

14        **THE COURT:**  These are fine lines.  You absolutely have a

15   right to explore the appropriateness of the Government's

16   investigation and it's often a key part of a defense, and you

17   have the right to impeach witnesses.  I'm just concerned about

18   the way you wrote this.

19        **MR. GOLDMAN:**  Well, they wrote it.  We just responded.

20        **THE COURT:**  All right.  So that wasn't your language.

21   That was the Government's language.

22        **MR. GOLDMAN:**  Correct.

23        **THE COURT:**  Okay.

24        **MR. GOLDMAN:**  We're just concerned that -- we don't intend

25   to invite nullification.  We intend to show that our clients

 1    are not guilty of the charged crime.  But this motion sweeps a

 2    whole bunch of extra stuff under the nullification umbrella

 3    that we don't think belongs there.

 4        **THE COURT:**  Okay.  So my concern is the motivation of a

 5    victim to report a crime, what they believe is a crime, and I

 6    don't think that's fair game.  That's really a very small part

 7    of the things that you've talked about, in my view.

 8        And I would also say that I won't know if I think you've

 9    crossed the line till I hear the question.  I just can't.  I

10    can't -- and I think that's the only way to be fair to you but

11    to tell you what my concern is.

12        So, Mr. Nedrow, comments on that?

13        **MR. NEDROW:**  Your Honor, the concern that the Government

14    had was that the defense was taking it too far across that line

15    into an area where it was, as the Court indicated, calling into

16    doubt the victim's motivations and the Government's motivations

17    in initiating the investigation.  And I appreciate the Court's

18    point and counsel's point, frankly, that a little bit of that

19    is appropriate.

20        On the other hand, what we're trying to get at is

21    encouraging the jury to, you know, disregard the law and not,

22    you know, follow the Court's instructions in a circumstance

23    where there's -- you know, suggesting corporate victims can't

24    be crimes or corporations can't go to the Government when they

25    feel that they've been victimized.

1    And those kinds of arguments --

2    **THE COURT:**  Yeah.

3    **MR. NEDROW:**  -- one can see how that could progress to an

4    area that I think is impermissible.

5    So I completely agree with the Court, it may just be when

6    the question is okay or not and there's a subtle way to get at

7    that theoretical bias, that's fine.  But blaming the corporate

8    victim with a law in Congress to protect corporate victims is

9    not appropriate.  That's what we're trying to request not be a

10   fair argument.  It's not.  That's not a fair argument.

11   **THE COURT:**  So, all right.  That's very helpful,

12   Mr. Nedrow.  Thank you.

13   I will not allow -- I will grant the motion to exclude any

14   evidence or argument that this should have been a civil case.

15   I will deny the motion -- well, let me back up.

16   I will grant the motion in terms of at the high level of

17   excluding jury nullification argument or evidence.  I will

18   grant the motion as to the issue of this should have been a

19   civil case.

20   I will deny the motion to the extent that the issue is

21   that the defendants' conduct did not rise to a criminal

22   violation.

23   I will defer on the third issue, in regard to the victim's

24   motive for seeking the charges.  And I think counsel is aware

25   of the concern I have, and you've informed me about where these

1  related issues could be relevant in impeachment and the

2  appropriateness of the Government's investigation.

3      So I think that's the best I can do on Number 7 for now.

4  I think we all -- I've learned something on it.

5      Okay.  I've just gotten to 3 o'clock.  I'm going to take

6  that break that I promised.  But we're moving along pretty

7  nicely.  So I haven't gotten to the hard ones yet, in a sense,

8  but we will.

9      Let's take a ten-minute break.

10      **THE CLERK:**  Court is in recess.

11                  (Recess taken at 2:59 p.m.)

12                  (Proceedings resumed at 3:11 p.m.)

13      **THE COURT:**  Is everyone back?  There's so many people in

14  the courtroom.  You have to help me on that.  I think

15  everyone's here.

16      **MR. GOLDMAN:**  I think everyone's here.

17      **THE COURT:**  Okay.  Thank you.  It's always good to get a

18  little break.

19      Okay.  Let's move on to the Government's in Limine Motion

20  Number 8, to exclude argument that the alleged trade secrets

21  must be in use or in continuous use by the owner to qualify as

22  trade secrets under the statute.

23      There's no opposition to the term "in use."  I'm not sure

24  there's any objection to this one.  Who's the --

25      **MR. OLMOS:**  Yes, Your Honor.  There is not an objection

 1  insofar as we understand the Government's position here.  We do

 2  not intend to argue that there is a necessary element under

 3  1832 or 1839 of continuous use.  We do not intend to do that.

 4      THE COURT:  Okay.

 5      MR. OLMOS:  We think that those issues are relevant for

 6  the jury to consider, but we will not argue that they are

 7  legally dispositive.

 8      THE COURT:  Well, I don't know that they're -- you can't

 9  argue that it's just a technical violation and it wasn't so

10  bad.

11      MR. OLMOS:  No.

12      THE COURT:  I'm not understanding what you're saying.

13      MR. OLMOS:  The fact that this product -- the fact that

14  Applied Materials had elected to end -- to terminate this

15  project --

16      THE COURT:  Yes.

17      MR. OLMOS:  -- we believe is relevant.

18      We believe it's relevant with respect to our clients'

19  state of mind.  We believe that it is relevant with respect to

20  whether the company took reasonable measures to protect the

21  alleged trade secrets in this case.

22      We do not believe that there is a necessary element of the

23  offense that is this continuous use element that the Government

24  seems concerned about.  But certainly, those six months that --

25  the three months that the Government is concerned about, the

 1   length of this conspiracy, there is -- this entire case is

 2   going to be around what the company did with respect to this

 3   technology and its decision to end this -- to end this unit and

 4   what it elected or did not elect to do with respect to the

 5   underlying intellectual property.  That's the whole case.

 6        THE COURT:  Sure.  So I guess, Mr. Olmos, what I --

 7   I guess what I'm not understanding, perhaps, is that a company

 8   can own a trade secret that it doesn't use.  It can put it in

 9   the vault.

10        MR. OLMOS:  Yes.

11        THE COURT:  And it's still a trade secret, and it still is

12   protected under this law.

13        MR. OLMOS:  Yes, that can be true.

14        THE COURT:  If the elements are proved.  The elements have

15   to be proved, of course.

16        MR. OLMOS:  Yes.

17        THE COURT:  But I think that's the whole point of not

18   using it, is an almost -- I'm not sure how -- it may be a fact

19   that can be mentioned in the sense that there was no product

20   being marketed with this technology.  I don't know that that's

21   even true, but that may be.

22        But the fact that a company decides that a -- and we'll

23   just assume a trade secret for the moment because we're talking

24   about the use of it.  But the fact that a company decides that

25   it's not going to continue to market certain technology doesn't

1    mean it's giving away to the public all of its confidential

2    information.

3        **MR. OLMOS:**  I agree with that, Your Honor.

4        **THE COURT:**  Okay.

5        **MR. OLMOS:**  I agree with.  However, if a company elects to

6    cease use of technology, if it elects to keep it in a vault, as

7    you say --

8        **THE COURT:**  Yeah.

9        **MR. OLMOS:**  -- that is relevant, we believe, to whether

10   the company could retain independent economic value from that

11   product, because what the circuits have equated that element to

12   a competitive advantage -- right? -- in the marketplace.

13        We think it's relevant, for example, to whether our

14   clients understood or knew that this technology was still

15   considered a trade secret by Applied Materials.

16        So, again, Your Honor, we will not argue -- well, I will

17   not argue that the fact that Applied had made these business

18   decisions to table this technology necessarily means that there

19   were no trade secrets involved here.  We will not argue that.

20        But we certainly think that the fact that the company made

21   these decisions and the reasons why they made these decisions

22   are relevant for the jury's consideration on multiple elements,

23   including our clients' state of mind as well.

24        **THE COURT:**  Well, certainly, I mean, especially for the

25   conspiracy, but for the other counts as well, knowledge of it

1  being a trade secret is an element.

2      Mr. Nedrow, can I hear -- or, Ms. Knight, hear from you on

3  this?

4      **MR. NEDROW:**  Your Honor, I guess the concern I have is

5  whether this is an acknowledgment of it's not correct to pursue

6  the continuous use argument and kind of a workaround to kind of

7  attack the same point.  I mean, I appreciate counsel's

8  acknowledgment that they shouldn't be able to use this as a

9  legal argument on the continuous use.  But turning around then

10  and saying, "Oh, but, you know, they put it in the vault, so

11  pay no mind to it now, and our defendants couldn't have

12  intended to commit the crime" is just another way of

13  reformulating the same point.  And that's what I think I hear

14  counsel saying.

15      So I don't think they should be able to -- be allowed to

16  argue that.  It is the Government's burden to prove intent, of

17  course, and so I acknowledge the defense can argue that

18  the Government needs to establish facts and show there's an

19  intent to take the trade secret.  But it sounds like the

20  defense wants to blame the victim for putting it in the vault

21  and then say, "Oh, and as a consequence, my client didn't

22  intend to take the trade secret."  And that's just another way

23  of repackaging the argument.  So --

24      **THE COURT:**  So --

25      **MR. NEDROW:**  -- we're concerned by that formulation.

1    **THE COURT:**  So certainly, an element is that the

2    information had independent economic value, it had economic

3    value in remaining secret.  So, I mean, I don't think whether

4    it's in use or not is necessarily relevant to the issue of the

5    value because -- I mean, what's also interesting to me -- and

6    it may be this just has to go to the jury -- I understand that

7    there's evidence that Dr. Chen was trying to work out a

8    licensing agreement where he would obtain investors who would

9    pay to license this technology, which I mean, that's just

10   evidence for the jury to consider whether he had knowledge that

11   it had value.

12   I mean, that's not for me to consider.  I just am aware

13   that that may be evidence in the case.

14   So I --

15   **MR. OLMOS:**  Your Honor, if I may.

16   **THE COURT:**  I do think that there is some relevance on the

17   issue of value as to whether the company was using it.  And it

18   could be a secret in every other way except having value.

19   I mean, we all may have some things that are secret and

20   we've done everything, taken reasonable steps.  It didn't have

21   any value.  It's just useless.  And then the case would fail;

22   right?  If there's no value, it's not a trade secret under the

23   law.

24   **MR. OLMOS:**  That's true, Your Honor.  That is very true.

25   If I take every measure known to humankind to keep a piece

1   of information secret, and yet if I try to walk out on the

2   sidewalk and sell it to a direct competitor and that direct

3   competitor says "I'm not going to give you a cent for that,"

4   that's relevant.

5        It's relevant, Your Honor, that the CEO of this company in

6   2012 sent an e-mail saying, "This tool does not have a

7   single" -- "We are not competitive in a single area with this

8   tool in the marketplace."

9        **THE COURT:**  That's a different issue, being competitive.

10  I mean, there can be value of the technology without having the

11  highest value on the market.

12       **MR. OLMOS:**  Well, not if they couldn't sell one.

13       So I think that, Your Honor, if the reason -- if one

14  primary reason why this company decided to end this unit was

15  that they had a failing product, and our clients clearly knew

16  that, that's relevant.  It's relevant to whether the -- on the

17  independent economic value issue, and it's relevant for our

18  clients' state of mind.  And that -- I mean, again, that's the

19  gravamen of this case.

20       **THE COURT:**  So the trade secrets at issue are not the

21  product.  These trade secrets are certain CAD drawings.  You

22  can have trade secrets that have value and they're in the wrong

23  product that has no market.  So it's a -- again, that's for

24  the Government to prove.

25       I mean, the issue of -- frankly, this is usually not the

1    battleground of trade secret cases.  It may be in this case

2    because it's an element.  It certainly can be.  But I guess

3    it's going to come down to, there's some latitude for you to

4    ask questions about why it wasn't in use.

5         Mr. Nedrow, the best I can do is to instruct the jury.  If

6    you want to craft a special instruction to the jury that I can

7    read mid-trial, I would be glad to do that; something to the

8    effect that there is no requirement that the trade secrets be

9    in use at the time of misappropriation.  Then we can -- that

10   may be a way to give the defense the opportunity to explore

11   this line of questioning on use to equate it to value.

12        In terms of reasonable steps, I mean, I don't know what

13   evidence you'll have.  We don't have to go through that.

14        So I am going to grant in Limine Motion Number 8 and

15   acknowledge and agree that the defense has the right to

16   question witnesses about the relationship of not using this

17   technology as it equates to the value of the technology or any

18   of the other elements of the charged offense.

19        Okay.  And for any of these circumstances where I indicate

20   that a special instruction is allowed, I will leave it to that

21   side to prepare it and let me know when you'd like it read.

22   And, of course, it's without prejudice to trial objections

23   should the questioning cross the line.

24        Okay.  Let's move on to in Limine Motion Number 9, to

25   admit e-mails between defendants offered by the Government.

1         So I recognize that this overlaps with the defense

2   Number 7.  Putting aside whatever the proper foundation is

3   necessary for the e-mails -- we'll get to that -- and, as I

4   say, the proper foundation, I am inclined to grant this motion

5   to allow the e-mails.  They're certainly generally statements

6   of a party opponent.  They are statements in an alleged

7   conspiracy.

8         I have a note here.  I have to go back and figure out what

9   my note was.  I was referring myself back to Number 3.

10        So, as always, absent the defendants testifying, they

11  certainly are not allowed to admit their own prior statements

12  in lieu of their testimony.

13        So, comments from the defense on my tentative that I would

14  grant this, subject to the proper foundation?

15        **MR. GOLDMAN:**  Yes, Your Honor.  Hi.  Raphael Goldman.

16  Sorry about the whack-a-mole here.

17        **THE COURT:**  That's all right.

18        **MR. GOLDMAN:**  So the Government asked the Court to admit a

19  large swath of e-mails that it says were sent by the various

20  defendants under a bunch of different rules, the opposing party

21  statement, co-conspirator statement.  We don't think it's

22  appropriate to grant this at the pretrial stage.  Admissions of

23  a party opponent, of course, are only admissible after a proper

24  authentication has been established.

25        Furthermore, those kind of statements are only admissible

1   against the particular defendant who made them.  With four

2   defendants sitting here, at the very least, there's going to

3   have to be limiting instructions.

4       **THE COURT:**  Not necessarily, if it's part of the

5   conspiracy, though.

6       **MR. GOLDMAN:**  Well, I'm going to get to that objection

7   next.

8       **THE COURT:**  Okay.

9       **MR. GOLDMAN:**  That's correct.

10      As to the co-conspirator statement exception, we briefed

11  this also in our own Motion in Limine Number 7.

12      The Government doesn't even dispute that it has the burden

13  of establishing evidence before any of these statements can

14  come in --

15      **THE COURT:**  Sure.

16      **MR. GOLDMAN:**  -- that a conspiracy existed; the defendant

17  against whom the statement was offered was a member of the

18  conspiracy; the declarant was a member of the conspiracy; and

19  the statement was made during the course of and in furtherance

20  of the conspiracy.

21      That's a lot of elements that remain to be established

22  before they're admissible.  It's hard -- I can't really see how

23  the Court could properly admit -- say they're admissible now

24  before the Government has put any of that evidence into the

25  record.  So we don't think it's met its burden under

 1    Rule 801(d)(2)(E), at least as of yet.

 2         You know, the final category that they talk about is any

 3    e-mails it seeks to introduce that include statements by

 4    non-defendants are admissible to demonstrate defendants'

 5    knowledge and intent and the effect on the hearer.

 6         You know, we have a couple points about this.  First,

 7    again, they're asking you to make a determination in a vacuum

 8    without identifying any particular e-mails.  It's hard to say

 9    whether an e-mail is relevant to state of mind without seeing

10    what the e-mail is.

11         Moreover, we can't help but find this argument pretty

12    ironic, given the Government's Motion in Limine Number 3, where

13    it's asking to exclude all of the defendants' own

14    contemporaneous e-mails that we would use to demonstrate the

15    defendants' own state of mind.

16         **THE COURT:**  So, of course, as Ms. Knight and Mr. Nedrow

17    point out, an opposing party has different latitude in

18    introducing statements of an opponent as an admission and not

19    hearsay than the declarant him- or herself.  So we're in two

20    different universes here.

21         **MR. GOLDMAN:**  That's absolutely true as to the hearsay

22    rule.  Of course, we will be introducing them as non-hearsay,

23    as --

24         **THE COURT:**  Well, so --

25         **MR. GOLDMAN:**  -- contemporaneous evidence.

1      **THE COURT:**  Right.  And I just don't think state of mind

2  is quite as elastic as you might wish it to be.  And I say that

3  recognizing that your client's state of mind is an important

4  element in this case.  But you put a much bigger cloak around

5  what you consider "state of mind" than I guess I would.

6      **MR. GOLDMAN:**  Well, I think we should pause here because

7  this is extremely important --

8      **THE COURT:**  Yes, it is.

9      **MR. GOLDMAN:**  -- for the defense.

10      Crucial elements in this case, as far as we're concerned,

11  are the defendants' knowledge and intent.  And one really

12  important way that you can determine -- that the jury can

13  determine someone's knowledge and someone's intent is by

14  looking at what the person said or what someone said to that

15  person at the time.

16      In a business context, one of the main ways people say

17  things to each other is by writing e-mails.  There's tons of

18  e-mails.  We expect that a number of contemporaneous e-mail

19  communications are going to be admissible as direct evidence of

20  the defendants' state of mind.

21      And, you know, I represent Dr. Chen, and so I'll talk

22  about his defense briefly.  You know, his defense will be in

23  part, as Your Honor mentioned, that his intent throughout the

24  relevant period was to establish and fund a business that would

25  seek to license and buy Applied's MOCVD technology; and thus,

1    that he never intended to convert the trade secrets, Applied's

2    trade secrets, without their authorization and he never

3    intended to injure Applied Materials.

4        And as part of that defense, we're going to introduce

5    communications showing that he expected that Applied would be

6    receptive to such an offer, in other words, statements in which

7    Dr. Chen himself displayed that kind of expectation;

8    communications showing why he might have had that expectation,

9    in other words, statements made to him encouraging him to have

10   that expectation; communications by Dr. Chen where he

11   demonstrated his intent to propose to license or buy Applied's

12   intellectual property; and statements showing that he had

13   nothing but goodwill toward Applied, going to his intent to

14   injure them.

15       We've provided a few e-mails as examples to the Court.

16   There's a number of others.

17       And it's our view that a criminal defendant is entitled to

18   prove his innocent state of mind through more than just his own

19   retrospective testimony sitting on the witness stand.  We have

20   to be allowed to corroborate what our clients say if they

21   testify with the abundant contemporaneous documentary evidence

22   that corroborates that they had an innocent state of mind.  Any

23   other result, in our view, would be a reversible error under

24   all the cases we cited -- *Leek* and *Brown* and *Perry* and

25   *Harris* -- because these e-mails are admissible for the

 1  non-hearsay purpose of showing what was in the defendant's mind

 2  at the time --

 3      So obviously, it's impossible for the Court to rule on the

 4  admissibility of hundreds of statements at this time; but we'd

 5  like you to -- I hope to impress upon the Court the importance

 6  of this evidence; and we're sure that you'll find, when you see

 7  the e-mails, that they're admissible.

 8      **THE COURT:**  And it will depend on the context in which

 9  they're being offered as well.

10      **MR. GOLDMAN:**  Of course.

11      **THE COURT:**  Mr. Nedrow, I may have my documents out of

12  order.  I have attached to this in limine motion, which is

13  Document 228, a list of exhibits.  I don't think there were --

14  that are at 230.  Have I misassembled this?  And the documents

15  include the Olgado temporary restraining order.  And I think

16  maybe that -- I'm not sure that belongs there.  Do I have them

17  out of order?

18      **MR. NEDROW:**  No.  Thank you, Your Honor.  No.  I think

19  they are in order.  And the reason --

20      **THE COURT:**  Okay.  Good.

21      **MR. NEDROW:**  -- that's attached, Your Honor, was to

22  actually directly address the things the defense says haven't

23  been addressed.

24      There isn't actually any good faith dispute as to where

25  these e-mails came from.  Donald Olgado gave them to Applied

1    Materials.

2        **THE COURT:** Oh, okay.

3        **MR. NEDROW:** That's his stipulation.

4        **THE COURT:** Yeah.

5        **MR. NEDROW:** That's Exhibit 1.

6        **THE COURT:** Sure.

7        **MR. NEDROW:** So we've put it there to start.

8        **THE COURT:** Oh, okay. Good.

9        **MR. NEDROW:** And then we have the correspondence where his

10   counsel --

11       **THE COURT:** Oh, okay.

12       **MR. NEDROW:** -- says explicitly he's giving the e-mails to

13   Applied.

14       And then we included five samples of the dozens or,

15   actually, hundreds of e-mails the defendants sent to each other

16   during their scheme to steal trade secrets. So that's why

17   those are packaged --

18       **THE COURT:** Thank you. Good.

19       **MR. NEDROW:** -- in that way.

20       **THE COURT:** I just wanted to make sure.

21       **MR. NEDROW:** Yes.

22       **THE COURT:** So, Mr. Nedrow, I think that the defendants

23   are certainly correct that in order to admit these e-mails as

24   statements by the four co-defendants, you do have to lay a

25   foundation about it being during the conspiracy and in

1    furtherance of it.

2        **MR. NEDROW:**  Yes.

3        **THE COURT:**  So I can't make that ruling now.

4        **MR. NEDROW:**  Yes, Your Honor.

5        **THE COURT:**  And I don't think you were asking me to.

6        **MR. NEDROW:**  No, Your Honor.

7        **THE COURT:**  So I'm not ruling that these are admissible.

8        **MR. NEDROW:**  Yes, Your Honor.

9        **THE COURT:**  And it raises a very difficult question if

10   they're only admissible against one defendant in a joint trial.

11       **MR. NEDROW:**  Yes.

12       **THE COURT:**  So I presume the Government has every

13   intention of laying that foundation.

14       **MR. NEDROW:**  Yes, Your Honor.  Yes.

15       **THE COURT:**  Okay.  So, yeah, because we have that other

16   issue coming up later.

17       So at just the level at which this in limine motion is

18   submitted, upon laying the proper foundation, these would be

19   the kinds of e-mails that would be admissible; and I cannot

20   rule on the actual admissibility until the Government has made

21   its -- put forth that evidence.  I think I have enough of a

22   proffer from you with the dates of these and the context of the

23   conduct of the alleged conspiracy that at a high level, it's

24   reasonable for you to be able to go forward on it.  Whether you

25   actually succeed at trial is another issue.

1    So it's preserved, Mr. Goldman, but -- and I'm not talking

2    about what the defense can do with the rest of the stack of

3    e-mails.  We'll get to that in a few minutes.

4    So I am going to grant this upon proper foundation for

5    these e-mails being submitted in evidence.

6    **MR. NEDROW:**  Thank you, Your Honor.

7    **THE COURT:**  In Limine Motion Number 10, to admit party

8    opponent admissions.

9    So the defendants' concern was that in this particular

10    motion, no specific e-mails were identified.

11    **MR. NEDROW:**  Yes, Your Honor, that's right.  And I guess

12    it's similar to how the Court just analyzed the prior motion in

13    that --

14    **THE COURT:**  Yeah.

15    **MR. NEDROW:**  -- we were seeking to establish the issue,

16    but not, you know, submitting to the Court at this time the

17    many, many statements made by the defendants that are their own

18    admissions.

19    You know, to the extent the defense is confused or citing

20    confusion, I mean, discovery includes many, many statements the

21    defendants made to colleagues at Applied, their own

22    declarations if the Government chooses to offer them,

23    statements they made in exit interviews at Applied Materials.

24    This is focused not so much on the e-mails, as the Court just

25    addressed, but the many other contexts in which the defendants

made their own statements, which we believe, under

801(d)(2)(A), are clearly admissible as admissions.

So I think kind of to go to the end on it, Your Honor,

we're asking for the same kind of, perhaps, acknowledgment of

the concept.  And we're happy to do that in a pretrial hearing,

if the Court wants; or if the defense wants, we can flag the

exact items that we think are admissible under 801(d)(2).

We've given a preview here on page 2, but there are specific

statements that we think are admissible.

**THE COURT:**  So here I become a little bit concerned about,

we're going on from e-mails among the defendants, which is a

little easier to envision your laying the foundation, to a

statement made by one of the defendants speaking, essentially,

on behalf of the conspiracy; the other defendants, in

furtherance of the conspiracy.  Is that right?

**MR. NEDROW:**  Yes, Your Honor, though, of course, these

statements are not -- the ones at least I'm referring to in

this motion are not in the category of, like, a *Bruton*-type

scenario, where they're giving some kind of interview.  These

are statements defendants are making to others as they're,

you know, going about their business in furtherance of the

conspiracy.

Now, for example, when Mr. Chen says "I'd like to buy the

licensing rights for this technology for millions of dollars,"

you know, full stop, that's incriminating, the Government would

argue, as to him.  And it's true, the other defendants might

think:  Yeah, it's pretty incriminating as to us as well.  But

that's not, the Government would submit, inadmissible as to

them.  It's a statement Mr. Chen made where he's interested in

buying the material for $6 million.

　　　　And I don't think there's an argument the defense has to

keep that admission out, even if it's true that the jury can,

you know, make -- draw inferences from that.  And the reason

for that is that statement doesn't directly inculpate other

people.  It's Mr. Chen saying --

　　　　**THE COURT:**  Sure.

　　　　**MR. NEDROW:**  -- "I want to buy this for $6 million."

　　　　**THE COURT:**  No, it's certainly not a *Bruton* issue.

　　　　**MR. NEDROW:**  Yes.

　　　　**THE COURT:**  All right.

　　　　**MR. GOLDMAN:**  I guess, Your Honor, from the defense

perspective, I just don't really understand what a ruling -- I

mean, if you grant this motion, what would that even mean?

　　　　**THE COURT:**  So my note here was that I was going to defer

on this one.

　　　　　　　　　　　　　　(Laughter.)

　　　　**THE COURT:**  So I think we are in the same place.

　　　　And, as I said, it's always easier for me to rule now and

have it done, but I can't do that.  I don't know what the

statements are going to be, and I don't know the context in

1  which they will be offered.

2       So for Number 10, I'm going to make the difference.  I did

3  grant Number 9 because those were e-mails, which I thought was

4  different.  On Number 10, the result may be very similar, but

5  I'm going to defer any ruling on Number 10.

6       And, of course, we all recognize there may be some offered

7  against -- for Count One, the conspiracy, and other statements

8  made as to one person that don't implicate others, and so --

9  and they may be admissions of a party opponent.

10      So I am deferring it.  I think that there's -- the

11  foundation is always only on the co-conspirator statements, and

12  there may be other types.

13      Okay.  Number 11 is to exclude the testimony of defense

14  expert Jon Berryhill.

15      And I'm sorry.  Their names didn't ring out to me.

16      So this is really a -- this is mostly a Rule 16 problem.

17  Is that right, Mr. Nedrow?

18      **MR. NEDROW:**  Yes, Your Honor.  We recognize Mr. -- or,

19  yes, Mr. Berryhill has expertise.  It was mostly Rule 16

20  concern about the disclosure.

21      **MR. ALTSCHULER:**  If I may, Your Honor, we've informed

22  the Government we're taking the position that we're not going

23  to be calling Mr. Berryhill.

24      **THE COURT:**  That makes it easy.

25      **MR. ALTSCHULER:**  So I think the issue is moot, at least

insofar as the other government witnesses stay within the four

corners of the reports.

**THE COURT:**  Okay.  So I'm going to actually grant this

motion on the representation that the defense is withdrawing

the witness.

Okay.  Number 12, to exclude the testimony of Samuel

Plainfield.

Let me remind myself of this witness.

So on this one, I understood from the opposition that a

supplemental disclosure was made, and I was inclined to deny

this motion without prejudice to the Government renewing the

motion if it finds that the supplemental disclosure was in some

way inadequate and that the expert actually is going to

testify.  I don't know whether he'll be used or not because the

defense says it may be unlikely that you need them.  So I only

saw the note that a supplemental disclosure was made.

Mr. Nedrow, I understand the Rule 16 obligation; but it's

so far ahead of trial, I think I'd be hard-pressed to foreclose

the presentation of the expert.

**MR. NEDROW:**  Thank you, Your Honor.

I think, if I may, we would ask maybe to defer other

arguments on that.

We did get a supplemental disclosure, and we appreciate

that, from Mr. Cassman.  We don't think -- we have concerns

exactly as to the scope of Mr. Plainfield's testimony because

1    it would be inadmissible for him to offer Mr. Chen's

2    statements.  And harkening back to Mr. Goldman's comments, the

3    defense isn't allowed to put in their own hearsay.  We disagree

4    with that premise fundamentally.  So we don't see how this is

5    going to have any relevance.

6        But I think it's an argument for another day and not one

7    necessarily to pursue right now.  So, so long as we can renew

8    that at the appropriate time, we're prepared to submit it.

9        Thank you.

10       **THE COURT:**  Okay.  So, well, I don't know what the

11   difference is between "deny without prejudice" and "defer,"

12   because you're going to have to rewrite the motion anyway.

13   Everything's changed because you have a supplemental --

14       **MR. NEDROW:**  That's true.

15       **THE COURT:**  All right.  I'm going to deny this motion.

16   That means I'm done with it.

17       **MR. NEDROW:**  Okay.  Thank you.

18       **THE COURT:**  Without prejudice.

19       **MR. NEDROW:**  Understood.

20       **THE COURT:**  It's all a matter of having a good record.

21       **MR. NEDROW:**  Yes.

22       **THE COURT:**  So this is denied, and then the burden is on

23   you to bring it back, because that's --

24       **MR. NEDROW:**  Thank you.

25       **THE COURT:**  -- without prejudice.

1          Okay.  In Limine Motion Number 13, to exclude the

2   testimony of expert Barry Naughton.

3          I guess I already showed my hand on this one.  So I am

4   concerned that under the *Sunstar* case and -- well, mostly

5   *Sunstar*, that there doesn't appear to be anything about

6   Dr. Naughton's testimony about what companies do in China under

7   the protection of their own government in avoiding the impact

8   of protections of trade secrets, that that would have anything

9   to do with what Applied does.

10         And I would also say that if Dr. Naughton's theory,

11  opinions had any plausibility, then every company in

12  Silicon Valley has opened its vaults and has no trade secrets

13  at all.  They've all been given away.

14         And somebody can call Tim Cook and say, "It's really too

15  bad that you do all that business in China, because you've

16  given it all away."

17         That is the only conclusion that I could draw from

18  Dr. Naughton's proposed testimony, is that American companies

19  are forewarned that if they do business in China, that they

20  have not taken reasonable steps to protect their trade secrets;

21  and hence, we'll never have another prosecution in

22  Silicon Valley again for theft of trade secrets because they've

23  all been given away.

24         I don't think this has any basis.  I think as a gatekeeper

25  under *Daubert*, I think that the position as it relates to -- as

1    it relates to Applied or any American company is, frankly,

2    preposterous.

3         But I don't feel strongly about it, Mr. Cassman.

4                           (Laughter.)

5         **MR. CASSMAN:**  I can tell you do, Your Honor, and you're

6    looking at the wrong guy.

7         **THE COURT:**  All right.  Then you're off the hook.

8         Whose is this?  Mr. Altschuler, are you going to tell me

9    why I'm wrong?

10        **MR. ALTSCHULER:**  I think Mr. Olmos is going to tell

11   the Court why the Court is wrong.  I'm going to try to explain

12   our position.  Small attempt at humor.

13        It's this, Your Honor.  Preliminarily, Dr. Naughton was

14   called by the United States about three months ago for many of

15   the same issues.

16        **THE COURT:**  Not by Mr. Nedrow and Ms. Knight, not by the

17   United States Attorney in the Northern District of California,

18   but by the United States Attorney in Tennessee.  Is that where

19   that case was?

20        **MR. ALTSCHULER:**  That's correct, Your Honor.

21        **THE COURT:**  Okay.

22        **MR. ALTSCHULER:**  And our position, quite frankly, is --

23        **THE COURT:**  Did Dr. Naughton give the same opinion in that

24   case, or was he just called for his expertise on other issues?

25        **MR. ALTSCHULER:**  Dr. Naughton gave opinions on many of the

 1  same issues and certain other issues.

 2      The Tennessee case was an economic espionage case as

 3  opposed to a trade secrets case.  But the preliminary or the

 4  foundational basis of his scholarship is the role of

 5  the government of the People's Republic of China in setting

 6  goals and priorities to officially publish documents concerning

 7  the acquisition of technology over various plans, including

 8  five-year plans.

 9      That is a very different operating system from what we in

10  the United States are used to.

11      And for that reason, I think it is -- it's fair to say

12  that this is -- this is a big issue, as the Court said.  I'm

13  not sure I would agree with the word "preposterous."

14      But what Dr. Naughton is prepared to testify to -- and we

15  would be happy to go through the necessary hearing outside the

16  presence of the jury -- is that it was well known on an

17  objective standard that American companies doing business in

18  the P.R.C. had a genuine risk of their intellectual property

19  being stolen back in the 2012 time frame.

20      And that's only -- that's the only time period that --

21      **THE COURT:**  Right.

22      **MR. ALTSCHULER:**  -- we're concerned with.

23      We're not going to get into, you know, what has come out

24  in this country, in the United States, since then.

25      But Dr. Naughton is prepared to describe both specific

1    instances, as well as what he has learned through his

2    scholarship, through his interviews with people in the P.R.C.,

3    through his interviews of other knowledgeable individuals.

4        And at a very basic level, this is a fundamental part of

5    our defense.

6        **THE COURT:**  So, well, everything you've stood on, that the

7    defense has talked about is fundamental.  So it does wear a

8    little thin.

9        Here's my concern, is that in your papers you suggest that

10    any company doing business in China has given up its trade

11    secrets because it knows it wasn't taking reasonable steps.

12    That's the problem with Dr. Naughton's testimony.  It proves

13    too much.  It proves so much to be ridiculous.

14        **MR. ALTSCHULER:**  If I may, Your Honor.  I think what

15    the Court is describing is perhaps a little bit more aggressive

16    than the position that we are actually taking.

17        We're not saying that American companies should not do

18    business in China because of the risk of IP theft.  What we are

19    saying is that if an American company with so-called trade

20    secrets wants to do business in the P.R.C., then it has to take

21    reasonable steps.

22        And it's for the jury to decide if adequate reasonable

23    steps consist of a written contract, together with an

24    amendment.  If the jury decides that that's enough, then that's

25    a factual question.  On the other hand, the jury may decide

1    that reasonable steps could include additional protections,

2    such as -- I don't know what those would be.  Perhaps it would

3    be security guards; perhaps it would be monitoring.  There's a

4    whole host of things.  But to have simply a written agreement

5    that says -- for arbitration, I believe, outside the P.R.C., we

6    think that is not adequate.  And that is a jury question.

7        With respect to Dr. Naughton's scholarship, I think

8    there's no question he's a preeminent expert, not only in

9    California, but nationally.  His C.V., which we provided and is

10   attached as a Government exhibit on June 8th, goes on for an

11   immense --

12       **THE COURT:**  I appreciate that.

13       **MR. ALTSCHULER:**  -- number of pages.

14       On June 15 we supplemented that and we provided an

15   additional letter, which is Exhibit 1 to my declaration in

16   opposition to this motion.

17       So we're not thinking on Dr. Naughton as anything except

18   an individual who has previously been qualified by

19   the Government as an expert, who has testified concerning many

20   of the same matters and, without question, is knowledgeable.

21       Now, if I may just divert to a different point for a

22   moment.  I think I heard the Court express some unhappiness

23   before the break concerning that this might be inappropriate to

24   talk about the Chinese or a Chinese company.  And I would like

25   to directly address that.

1    **THE COURT:**  Well, and the Government provided me with a

2    case cite to the *Jinro America* case that dealt exactly with

3    that issue.

4    **MR. ALTSCHULER:**  Well, I think -- if I may, I think the

5    issue is different because in connection -- first, in

6    connection with Dr. Naughton's testimony, I will instruct him,

7    and the Court may instruct him, before he testifies, this is

8    not about the Chinese people or any other ethnic group.  This

9    is about -- this is about a state-sponsored directive from a

10   government.  And the government happens to be in China.  It

11   could be anywhere else in the world.  And so that puts it in a

12   very different category.

13   **THE COURT:**  But it's the conduct of Chinese companies as

14   approved by their government.  The government isn't directly

15   stealing trade secrets.  It's the companies are running

16   roughshod over NDAs and other protections under the protection

17   of their government and the desire of their government to

18   obtain the trade secret information.

19   **MR. ALTSCHULER:**  Your Honor, I think the desire of

20   the government to -- the Chinese government to obtain trade

21   secret protection -- trade secret matters is something that

22   cannot be either overstated or understated, nor can it be

23   adequately appreciated --

24   **THE COURT:**  So Dr. Naughton would basically testify to the

25   China effect on trade secret law, because every company is

1  doing business in China.

2      **MR. ALTSCHULER:**  I'm not --

3      **THE COURT:**  It's the biggest economic engine in the world.

4  And it's the rare company, and it's certainly companies of the

5  magnitude of Applied Materials or any of our other companies

6  here -- it is not possible to exist in the global economy

7  without doing business in China.

8      So you're really saying that the China effect is to

9  increase the standard necessary to take reasonable steps to

10  protect your trade secrets.

11      **MR. ALTSCHULER:**  I think -- Your Honor, I'm not sure it is

12  so much what I am saying.  But we also include --

13      **THE COURT:**  No.  I appreciate it's what the expert is

14  saying.

15      **MR. ALTSCHULER:**  I beg your pardon?

16      **THE COURT:**  It's what the expert is saying.  I appreciate

17  that.

18      **MR. ALTSCHULER:**  And if I may, it's also what Applied

19  Materials described in their 10-K for fiscal year ending

20  October 28, 2013.

21      **THE COURT:**  I'm sorry.  If that was in the papers, I

22  missed it.

23      **MR. ALTSCHULER:**  That we provided at, I believe, page 26

24  of the 10-K.

25      **THE COURT:**  Oh, I did see that, the 10-B.  Yes, yes.

1    **MR. ALTSCHULER:**  That's right.  Applied knows it's a risk.

2    **THE COURT:**  Sure.

3    **MR. ALTSCHULER:**  And it's a business decision that the

4    company makes when and where it wants to do business.  And it's

5    a business decision the company makes as to what steps it wants

6    to take to protect its own intellectual property.

7    The unfortunate position that Dr. Chen, Mr. Olgado,

8    Dr. Hsu, and Mr. Ewald are in is that Applied is basically

9    trying to have it both ways.

10    **MR. OLMOS:**  And, Your Honor, if I may add --

11    **THE COURT:**  Yes.

12    **MR. OLMOS:**  -- this.

13    Sorry.  I think, actually, what the Court just said,

14    attributing to Dr. Naughton an opinion that if you -- if a

15    company -- and I think "doing business in China" is too broad

16    of a concept.  Your Honor is right that there may not be a

17    Silicon Valley company of worth, of note that does not do

18    business in China, and that's not what we are saying here.

19    Dr. Naughton's proposed testimony -- and I invite

20    the Court to our June 15th supplemental disclosure -- is much

21    narrower.

22    **THE COURT:**  Is that something I have?  Where would I have

23    that?

24    **MR. OLMOS:**  It's Exhibit 1 to Mr. Altschuler's opposition.

25    **MR. ALTSCHULER:**  It's ECF 270-1, Your Honor.

1    **THE COURT:**  That wasn't part of your separate -- I have

2    your -- is it this big compendium that you gave me, Exhibit 1?

3    **MR. ALTSCHULER:**  There's a very large document.  That's

4    the Form 10-K.  That's Exhibit 2.  The exhibit that precedes

5    it --

6    **THE COURT:**  Yes, I have it.

7    **MR. ALTSCHULER:**  -- is --

8    **THE COURT:**  Yes.

9    **MR. ALTSCHULER:**  Thank you.

10   **THE COURT:**  It has a piece of metal over the top of the

11   ECF numbers.

12   **MR. OLMOS:**  And so, Your Honor, I think what I hope that

13   disclosure does is take it away from doing business in China

14   into a much narrower focus; and that is this:  that when the

15   Chinese government institutes and publicizes these

16   five-year plans and, together with those five-year plans,

17   issues very specific directives with respect to specific types

18   of technology that the Chinese government is emphasizing it

19   wants to acquire, and it wants to acquire it through its

20   relationship with Chinese businesses.  And it describes step by

21   step how it is going to incentivize Chinese companies to

22   acquire this technology.

23       And we're not saying this in a vacuum.  We have evidence

24   in this case that the corporate officers at Applied Materials

25   knew about those plans and discussed how to take advantage of

1    those plans in its business practices.

2        To then say we, as a company, are going to send, not in

3    our own design center in China, not into our own foundry in

4    China, but to a company in China, this precise technology that

5    has been targeted by the Chinese government specifically, with

6    it, protecting it through an NDA -- and that is what

7    the Government will argue in this case, that that piece of

8    paper constitutes a reasonable measure to protect that

9    particular piece of technology that has been specifically

10   targeted by the Chinese government.

11       And what Dr. Naughton will say is not that this Chinese

12   company or the Chinese government is on trial here, but it was

13   not reasonable for Applied Materials to rely on that piece of

14   paper to send this particular piece of technology to a Chinese

15   company.

16       **THE COURT:**  And that's in the absence of any testimony by

17   Dr. Naughton that these trade secrets at issue were, in fact,

18   misappropriated by any Chinese company?

19       **MR. OLMOS:**  Correct.

20       **THE COURT:**  Just the risk, the potential.

21       **MR. OLMOS:**  The potential.  And that is the potential,

22   based upon his 40 years of scholarship and research, based on

23   his review of documents and information, again, provided by the

24   United States Government.

25       And I will say, Your Honor, that although Dr. Naughton did

1    testify in March in the District of Tennessee, Ms. Knight and I

2    just finished, actually, during the pandemic a bench trial on

3    an economic espionage case where the Government had an expert,

4    James Mulvenon, who was permitted in that case to testify

5    regarding the Chinese government's structure and its

6    relationship with Chinese businesses.

7         And there are ways, Your Honor, in the way there was in

8    March in the trial where Dr. Naughton testified, to narrowly

9    tailor his testimony so that it can help the jury understand

10   that if you are sending a piece of technology, a specific piece

11   of information to China that the Chinese government has

12   explicitly targeted and you were relying solely or almost

13   entirely upon an NDA with that Chinese company, that in his

14   expert opinion, that's not reasonable.

15        And, Your Honor, that is -- and maybe we've said it too

16   much, that different things here are central to our defense;

17   but, Your Honor, this is -- our clients knew about this, knew

18   about what Applied Materials was doing with respect to this

19   technology.  And there will be -- this case will be awash with

20   evidence about what Applied Materials was asking Dr. Chen to do

21   in China with respect to this technology, to sell it, to find a

22   buyer, all those things.

23        This is much narrower than that.  We are not disputing

24   that Applied Materials should not do business in China.  We're

25   not disputing that anybody shouldn't do business in China.  We

1  were trying to do business in China, the defendants were.  This

2  is very narrowly, specifically tailored to this piece of

3  technology --

4       **THE COURT:**  And Dr. Naughton --

5       **MR. OLMOS:**  -- that's been targeted.

6       **THE COURT:**  -- will testify that none of his opinions have

7  to do with anything specific that Applied did?  He's speaking

8  at a high level of scholarship.

9       **MR. OLMOS:**  Absolutely.  Absolutely.  And we are not

10 asking him to opine on any specific thing in this case.  We are

11 not asking him to opine on whether Applied --

12      **THE COURT:**  So you're not going to say "Dr. Naughton,

13 hypothetically, if" and then lay out the facts of what you

14 believe Applied did?

15      **MR. OLMOS:**  Not if the Court won't let me, I won't.

16                           (Laughter.)

17      **THE COURT:**  That was a good one.

18      **MR. OLMOS:**  But I think that's right, Your Honor.  I think

19 that we have plenty of evidence that we intend to introduce

20 through the testifying corporate officers by the Government, or

21 that we hope to introduce, that they were aware of these

22 specific programs; that they wanted to take advantage of these

23 specific programs; that we don't -- if the price of getting

24 Dr. Naughton's narrow opinion in is that we cannot ask him

25 hypotheticals, then that's a price we're willing to pay,

1  because if all the jury hears is that "Okay, yes, we sent this

2  stuff, but we had an NDA," and the jury doesn't understand what

3  that means with respect to how that Chinese company and how the

4  Chinese government is structured and the relationship between

5  the Chinese government and Chinese private enterprises that are

6  targeting this specific technology, if we're not able to

7  educate the jury about that, the jury is left with:  Oh, it

8  must be an NDA like an American company.  An NDA is an NDA is

9  an NDA.

10      And we don't believe, under this specific factual

11 scenario, that that's true.  And that's what Dr. Naughton will

12 say.  And if he can't say a single word more than that, then

13 we'll live with that.

14      **THE COURT:**  Okay.  Mr. Nedrow?

15      Ms. Knight?

16      **MR. NEDROW:**  Yes.  Thank you, Your Honor.

17      Dr. Naughton in Tennessee didn't testify about American

18 companies.  He's not a qualified expert in American companies.

19 And he is absolutely excludable under *Daubert* or 702 for this

20 testimony.  He's not an expert on it.

21      He's an expert on aspects of what the defense has

22 described, which is this government initiative to try and get

23 technology, and I assume that's why he testified in Tennessee.

24      And I think it also resonates with the description of

25 Ms. Knight's case, where the economic espionage case required

1  that as an element.  And I think an important distinction

2  that's been glossed over is that the economic espionage charged

3  cases require proof of an element that a foreign entity is

4  involved in trying to get the technology.  And that's not an

5  element here.

6      And that's why this is objectionable testimony, for a lot

7  of reasons, but also under 403 because it's confusing.  It's

8  going to confuse the jury that they need to make a finding

9  about the involvement of the Chinese government in this case

10 when that's not what this case is about.

11     The Government could have, but did not, charge this as an

12 economic espionage case.  Or, I say "could have" in the sense

13 that it evaluates facts and law and thought about whether to

14 charge it that way.  It didn't because the Government is not

15 pursuing proof that there was the involvement of the Chinese

16 government in the way there was in the case cited by Mr. Olmos

17 with Ms. Knight, or in the Tennessee case.  It's the trade

18 secret theft case, and we're not required to prove the

19 involvement of a foreign entity.

20     And it's pretty clear from Dr. Naughton's résumé that he's

21 an expert on China.  But he's not an expert on American

22 companies.  He's not on expert on NDA policies of American

23 companies.

24     And, you know, the defense said flat-out in their

25 papers -- this is in ECF 270, the defense response to

1  the Government's motion in limine -- (reading):

2        "Dr. Naughton will opine that any reasonably

3     informed large, high technology business operating in

4     a P.R.C. would have been aware of these incidents

5     [involving China]."

6     And he can't testify to that.  You can't have an expert

7  come in and say, "That victim shouldn't have given money to

8  this fraud scheme because any victim would be aware that you

9  can't give money to a scheme."

10    You know, what the defense wants is, if you parked your

11 car in that part of town, you have to have extra protections on

12 it or your problem if your car gets ripped off.  And it is kind

13 of a defensive argument, if I may say so.

14    But beyond -- trying to drain all that out of it and just

15 look at the facts of it, it's not an argument that finds

16 appropriate application to the charges in this case.  The

17 charges in this case are stealing of trade secrets without the

18 extra element of proving a foreign entity.

19    And if this were an economic espionage case, which draws

20 it closer to the Tennessee case, I understand to some extent

21 the defense point because you're putting into question the

22 element of a foreign entity.  But the Government's not putting

23 that in here.  The defense is trying to inject that into it by

24 having Professor Naughten testify.  And because it doesn't

25 actually go to an element and it's going to confuse the jury,

1    I think that's the thrust of our objection.

2        So we continue to object.  We'd ask for a *Daubert* hearing

3    if the Court deems it appropriate.

4        And I have one other respectful request.  And I apologize.

5    Maybe we should have done this initially.  I think the

6    transcript of Dr. Naughton's Tennessee testimony is going to

7    show he did not testify about American companies and NDAs.  I

8    think in the Tennessee case he testified about, again, the

9    business of the Chinese government being involved in trying to

10   get technology.

11       And we'd ask to be able to supplement the record with

12   that, because if that's all he was testifying about, that

13   doesn't really even have an overlay with the charges.

14       **THE COURT:**  So I'm not actually concerned about what

15   happened in the Tennessee case.  I don't think it matters.

16       So I am very concerned, Mr. Olmos, that what you suggest

17   that Dr. Naughton will testify to has to do with what

18   U.S. companies know and do.  And that, I won't allow.  He's not

19   an expert.  That's a straight-out *Daubert*/702 issue.

20       And you framed it very differently in your oral

21   presentation:  that Dr. Naughton would testify about what the

22   goals of the Chinese government have been and publicized

23   what -- and circumstances in China.

24       But you suggest (reading):

25           ". . . Dr. Naughton will testify" --

1    This is what Mr. Nedrow read.

2    (Reading):

3        -- "that between 2010 and 2012 there was a

4    common understanding among U.S. businesses" --

5    That's on page 2 of your opposition at line 8.

6        ". . . doing [sic] business in the P.R.C. that

7    the Chinese government regularly used extralegal

8    means to acquire the intellectual property . . . ."

9    You've given me no indication that Dr. Naughton is an

10   expert in what U.S. companies know.  For him to testify about

11   what is done in China is a different issue.

12   (Reading):

13       "Dr. Naughton will opine that any reasonably

14   informed large, high tech [sic] business operating in

15   the P.R.C. would have been aware of these incidents."

16   Again, I don't know.  That's outside his expertise as

17   well.  And so you seem to have limited yourself today or

18   suggesting you could limit his testimony to what the

19   circumstances are in China, and then that would give you the

20   opportunity, of course, to cross-examine the Applied Materials

21   witnesses about their knowledge and what they did that was

22   different.  But it's not going to come in through Dr. Naughton.

23   **MR. OLMOS:**  Understood, Your Honor.

24   So if I understand the Court's ruling, if we're looking at

25   the supplemental disclosure of Dr. Naughton's testimony, what I

1    will call --

2        **THE COURT:**  That's a bigger document, and let me get that.

3        **MR. OLMOS:**  Just the June 15th.

4        **THE COURT:**  Yes, I have it.

5        **MR. OLMOS:**  It looks where we did attempt to narrow

6    Dr. Naughton's opinions.  There are two opinions listed.

7        One is Opinion A on page 4.

8        **THE COURT:**  Page 4.

9        **MR. OLMOS:**  And then there is the second opinion, we'll

10   call it Opinion B, starting on page 8.

11       **THE COURT:**  Page 4.  You're looking at the numbers at the

12   top?

13       **MR. OLMOS:**  At the top, yes, Your Honor.

14       **THE COURT:**  So I start with a page 5.  I don't know what

15   page 4 is.

16       So the one -- is it the page that says, "Dear Counsel,

17   Dr. Naughton's qualifications" -- I'm just not on the same page

18   as -- so I've got -- is there a numbered paragraph that you're

19   looking at?

20       **MR. OLMOS:**  There's a numbered paragraph I'm looking at.

21       **THE COURT:**  And what is that?

22       **MR. OLMOS:**  It is 7.

23       **THE COURT:**  Thank you.  That seems to be page 7 of the ECF

24   number.

25       **MR. OLMOS:**  And it's Exhibit 1.

1      **THE COURT:**  Well, then paragraph 7 says he'll offer the

2  following opinions, and then it goes to 8 (reading):

3          "That the P.R.C. government" --

4      Am I looking at the same document?

5      **MR. OLMOS:**  I don't think we are, Your Honor.

6      **THE COURT:**  I don't think so either.  It's a June 15

7  letter, "Dear Counsel."

8      Once these things have these metal brads in them, I can't

9  see the ECF number.

10     **MR. OLMOS:**  Understood.

11     **THE COURT:**  I'm not going to take this apart.

12     **MR. OLMOS:**  If I may approach, Your Honor.

13     **THE COURT:**  Yes.

14     **MR. ALTSCHULER:**  Dan, take the one with the ECF numbers on

15  it.

16     **THE COURT:**  I'm not taking the file apart.

17             (Co-counsel confer off the record.)

18             (Document handed up to the Court.)

19     **THE COURT:**  I'm looking at Mr. Altschuler's June 15

20  letter, but it doesn't seem to -- let's see if it's the same.

21     Yes, it starts on page 5.  Yes, that's what I'm looking

22  at.  I don't know where you were reading page 4.

23     **MR. OLMOS:**  What's that?  I'm sorry.

24     **THE COURT:**  It starts at page 5.

25     **MR. OLMOS:**  And I think -- so we apologize for that,

 1    Your Honor.   There are page numbers at the top in the header.

 2    The header is "AUSA Susan Knight."

 3         **THE COURT:**  The header is obscured.

 4         **MR. OLMOS:**  I apologize.  Well, if we go to paragraph 7 of

 5    this letter.

 6         **THE COURT:**  Okay.  But paragraph 7 doesn't have any

 7    content to it.  It's just the introductory:  We anticipate he

 8    will offer the following opinions.  And then it goes on to

 9    paragraph 8.

10         So, I mean, I'm looking at the document you just handed

11    me.  Are you looking at the same document you handed up to me?

12         **MR. OLMOS:**  Apparently we're not.  I will approach again.

13                   (Document handed up to the Court.)

14         **THE COURT:**  Yeah.  Paragraph 7 doesn't have any content to

15    it.  I'm not sure what you're talking about, Mr. Olmos.  I see

16    a paragraph 8 that starts (reading):

17              "That the P.R.C. government has an intensive and

18         multi-stranded effort" --

19         **MR. OLMOS:**  Right.

20         **THE COURT:**  (Reading):

21              -- "both inside and out" --

22         That's paragraph 8.

23         **MR. OLMOS:**  Right.  Paragraph 7 starts (reading):

24              "In addition to the Rule 16 information . . . ."

25         **THE COURT:**  Right.

1    **MR. OLMOS:**  And then there is a sub (a).

2    **THE COURT:**  Yes.

3    **MR. OLMOS:**  (Reading):

4         "Opinions related to the P.R.C. government's

5         efforts to obtain foreign technology."

6    **THE COURT:**  Okay.

7    **MR. OLMOS:**  That is what I understood the Court to be

8    saying it was positively inclined to letting us get into.  That

9    is directly in line with Dr. Naughton's experience and

10   research.  That goes through paragraph 20 -- 20.

11   **THE COURT:**  Okay.  Well, at 18, we hit the skids.

12   (Reading):

13        "That because of the high priority the P.R.C.

14        government has placed on technology acquisition, in

15        the 2010 to 2012 time period, there was a widespread

16        understanding among U.S. government officials and

17        U.S. businesses seeking to do business in the P.R.C.

18        that the Chinese government would not

19        hesitate . . . ."

20   So it gets to what American companies knew.  That's where

21   I'm drawing the line.

22   **MR. OLMOS:**  Understood.  Understood.  And we understand

23   this Court's ruling.

24   **THE COURT:**  Okay.  Let me give you back your document

25   because I did have the right one.

1    Okay.  So, Mr. Nedrow, thank you for that argument.  I

2  will limit Dr. Naughton to opinions only regarding

3  circumstances in the P.R.C., and not how that may or may not

4  have been understood by American companies.

5    **MR. OLMOS:**  Thank you, Your Honor.

6    **THE COURT:**  And that's on the basis of his qualifications

7  and that he is not an expert in American companies.

8    Okay.  So that does not preclude the defense from then

9  impeaching Government witnesses with this information as to

10  what they might have known and been aware of.  So, I mean, it

11  sort of goes that same way.

12    Okay.  So that's a grant in part and deny in part.  And

13  it's based on Exhibit 1 to the Altschuler declaration, and

14  that's the June 15 supplemental disclosure.

15    Okay.  I don't believe we need an evidentiary *Daubert*

16  hearing on Dr. Naughton.

17    In Limine Motion Number 14, to exclude the testimony of

18  defense expert Michael Begarney.

19    This is similar to Mr. Plainfield, or Dr. Plainfield, in

20  that the defense has supplemented --

21    **MR. NEDROW:**  Yes, Your Honor, if I may.  I don't mean

22  to --

23    **THE COURT:**  Yes.  Go ahead.

24    **MR. NEDROW:**  -- interrupt.

25    **THE COURT:**  Go ahead.

 1        **MR. NEDROW:**  But I can perhaps truncate this or --

 2        **THE COURT:**  Okay.

 3        **MR. NEDROW:**  And that's simply that I have conferred with

 4   Mr. Cassman on this particular motion, Your Honor.  And what I

 5   was seeking to clarify was the scope of -- regarding his

 6   testimony.

 7        And so long as it is limited just to issues described in

 8   PowerPoint presentations and marketing materials, which he does

 9   describe and he does have a background, the Government,

10   you know, is prepared to submit it on that and not -- or

11   even -- I would say, we certainly are going to have

12   cross-examination and questions for the doctor, of course.  But

13   we understand he's an expert, and if it's limited in that

14   manner, we don't have a problem with it.

15        **THE COURT:**  All right.  Then I will deny this motion.

16        Okay.  Good.  Thank you.

17        All right.  Are we ready to go for a seventh-inning

18   stretch here?  Let me get --

19        So I think we can at least make an initial sprint down

20   some of these motions because we've covered them in the earlier

21   discussions.  So let me -- I'm not going to go a minute past

22   5:00, but I have some hope that we might finish, and that would

23   be great for everyone.

24        Okay.  In Limine Motion Number 1 is a request for a jury

25   questionnaire.  And so that's granted, and we've discussed it.

1    I don't think there's anything more we need to discuss on

2    Number 1.

3        In Limine Number 2 is for additional peremptory

4    challenges.  And that has been granted, and we fully discussed

5    that one.

6        In Limine Motion Number 3 regarding COVID-19 protocols,

7    I believe we've covered everything in that one as well.

8        **MR. GOLDMAN:**  Yeah, I think so, Your Honor.  I mean,

9    because I'm a defense attorney, I'll say we don't withdraw our

10    objections to witnesses testifying with masks or jurors being

11    seated too distant to see the witnesses, but we'll just have to

12    see how the situation works out in a month from now.

13        **THE COURT:**  That's certainly reasonable.  I'm not asking

14    you to withdraw your objections.

15        I think I've ruled on it in terms of witnesses.  Witnesses

16    who are fully vaccinated and who are themselves comfortable

17    testifying without a mask may.  Witnesses who are unvaccinated

18    may not testify without masks.

19        And jurors will be given the opportunity, if fully

20    vaccinated, to sit in the jury box.  Any juror who is either

21    unvaccinated or uncomfortable sitting cheek to jowl with their

22    fellow jurors will be given space in the audience of the

23    courtroom.  And we will make sure that we have paper copies of

24    documents for them when confidential documents are being

25    reviewed.

1          And the defense certainly preserves all of its objections.

2          Okay.  In Limine Number 4 is to implement prior court

3    orders.

4          That's always my intention.  I don't know that we need

5    this.  So we've taken care of the -- let's see.  Well, I don't

6    think there's really any controversy.  I'm not going to issue a

7    further order here.

8          So I am going to deny this as unnecessary, with the

9    understanding that of course my orders will be enforced.  But I

10   don't want to adopt any language from this motion that might

11   change them.  All parties are required to follow the Court's

12   rulings, that goes without saying, and to instruct your

13   witnesses that they are to do the same.

14         In terms of the superseding indictment -- or maybe it's

15   just the original indictment -- the word "including" doesn't

16   need to be physically removed because we've agreed not to give

17   the jury the indictment.

18         Okay.  In Limine Number 5, to exclude improper lay

19   testimony.

20         All right.  So this one is a little more involved.  Let me

21   just remind myself of the scope of it.

22         So this has to do with Mr. Tanaka and Mr. Scocca,

23   S-c-o-c-c-a.  So, generally, it appears to me that

24   the Government is offering these witnesses for proper lay

25   opinion testimony.  The testimony that I understand will be

1  elicited from them has to do with information they know and

2  work with on a day-to-day basis in their jobs.

3      Certainly, a lay witness cannot testify that certain

4  information was a trade secret.  They certainly can't do that.

5  But a lay witness could certainly testify based on -- if that's

6  that person's everyday work, they can testify about how it was

7  stored, how it was restricted, what the requirements were on

8  sharing.  This is all company protocols.  Of course they can

9  testify to it.  They're the only ones who would know how things

10  are -- the requirements for NDAs.  They can certainly

11  testify -- they can also testify about the value of the secret.

12      And, of course, I mean, obviously not everyone would be --

13  you have to lay a foundation for their knowledge in their

14  everyday conduct.

15      But I don't see any problem with Mr. Scocca.  It seems as

16  though he's being offered to testify about what has become the

17  fairly ordinary job of an in-house tech expert or security

18  expert on extraction of e-mails from company computers.  It

19  doesn't seem to really be a forensic analysis of anything.  It

20  seems like even I could probably extract a lot of things from a

21  computer.  I probably couldn't get the metadata, but any

22  17-year-old could, I think.

23      So I don't really -- at this level, I'm not seeing a

24  problem here.  That's not to say that the Government might not

25  go too far and that an objection would be appropriate in the

1  course of the questioning.  But at this high level, I'm just

2  actually not seeing any particular problem based on how I

3  understand these witnesses that have been identified would be

4  utilized by the Government.

5      **MR. CASSMAN:**  So the defense has two primary concerns.

6      **THE COURT:**  Okay.

7      **MR. CASSMAN:**  The first one has to do with Mr. Scocca.

8  And it is true he was director of the security, global security

9  for Applied; and he conducted an investigation, apparently,

10  that required forensic downloading and preservation of data.

11      **THE COURT:**  That's probably what he does for a living,

12  though.

13      **MR. CASSMAN:**  He didn't do it personally.  He did not do

14  it personally.

15      **THE COURT:**  Right.  Okay.  I understand.

16      **MR. CASSMAN:**  He had a team of people.  It included a

17  third-party company called Digital -- escapes my memory right

18  now -- Digital Strata that he hired to do this process.  So we

19  have hearsay problems infecting his testimony from ab initio.

20  He can't testify to procedures and processes that he did not

21  participate in.  And it would be entirely inappropriate;

22  obviously, hearsay.

23      I disagree with the Court if you're suggesting that

24  high-level technological downloading and preservation of

25  forensic evidence in a forensically appropriate way is not the

1  proper subject of an expert.  And, in fact, as you know, we

2  proffered Samuel Plainfield as an expert for exactly that

3  purpose.

4        **THE COURT:**  Sure.

5      **MR. CASSMAN:**  Because if there's a question as to

6  authenticity, then it has to pass forensic standards.

7        And in this case, the Government is going to be offering

8  Mr. Scocca, apparently, to come in and testify that these

9  procedures that were followed by other people under his

10 direction were adequate because they told him so.  That's what

11 he says in his declaration (reading):

12          "I base this on my own personal knowledge and on

13          information that was provided to me by others."

14      That is not the stuff of lay opinion testimony and it's

15 not appropriate.  And it's exactly what the differential

16 between an expert witness and a lay witness was put in place

17 for under the federal rules.  So that's --

18        **THE COURT:**  Well, on --

19        **MR. CASSMAN:**  -- number one.

20        **THE COURT:**  -- that issue, yes, that's an issue we'll have

21 to -- I'll have to come back to the Government on.  Okay?

22      **MR. CASSMAN:**  Our second major concern has to do with the

23 PowerPoint presentations that our client, Dr. Chen, presented

24 to potential investors.  The indictment alleges that that

25 PowerPoint included confidential information.

We have received a summary expert opinion from a Dr. Goetz, from the Government, that includes no reference to the PowerPoint whatsoever.

**THE COURT:** Okay.

**MR. CASSMAN:** Not to a single slide on any PowerPoint that was presented by Dr. Chen.

We have received witness statements summarized in their witness list. There's not one reference to a PowerPoint presentation. We've received the Government's trial memorandum which includes not one reference to the PowerPoint presentation that Dr. Chen presented.

Dr. Chen, by contrast -- and we're going to get to the civil case in a minute -- submitted a declaration, contemporaneous with the charges of this case, during the course of the alleged conspiracy, setting forth his belief that there were no trade secrets, that there was no confidential information, and that it was all publicly available. That was his belief at the time. We intend to prove it. We expect the evidence will show it.

But the concern here is that the Government will attempt and intends to present scientific technical information through lay witnesses as a surprise, a prejudicial surprise to the defense. And that's the purpose of this motion.

**THE COURT:** Well, I don't know what surprise there is. It looks like you're fully advised as to what they're going to do.

1          Mr. Nedrow?

2          Ms. Knight?

3          **MR. NEDROW:**  Yes.  Thank you, Your Honor.

4          There's no surprise at all.  Defense has had discovery of

5     these witnesses for years, and it's been laid out again and

6     again and again.  Defense knows what Mr. Tanaka was going to

7     say about the technical background of developing these parts.

8          Defense also knows -- and I should be clear on this to

9     the Court -- that it's not just Mr. Tanaka.  It's Brian

10    Burrows, Mark Pinto.  There could be a couple of other Applied

11    witnesses who, because of their jobs, will be asked to testify

12    about what they did as percipient witnesses in their jobs.

13         And, of course, because they're engineers who put their

14    hard work into developing the things that Mr. Chen and the

15    others allegedly took, they're going to describe the things

16    that they saw and they did.  And it is somewhat technical in

17    nature, but it's because they're describing what they actually

18    worked on as percipient witnesses.

19         And we agree that the Court is quite right in

20    describing -- or perceiving that as appropriate specialized

21    testimony of a percipient witness who happens to have a

22    technical background.

23         **THE COURT:**  All right.  So let's turn back to Mr. Scocca,

24    who did rely on a third party.  I am concerned about that.

25         If he gave a third party a protocol to follow and they

 1    said, "Yes, boss, we followed it," maybe that's not what he's

 2    going to say, but that doesn't really sound like something that

 3    could come in through a lay witness.

 4         What can you say?

 5         **MR. NEDROW:**  Yes.  Thank you, Your Honor.

 6         Well, as to that, we don't agree with the summary provided

 7    by counsel.  And it's our understanding that Mr. Scocca does

 8    have a number of things he can firsthand testify to as a matter

 9    of personal knowledge, that he was hands on in being involved

10    in these investigations, had a lot of experience in it, and

11    reviewed data and looked at things that will give him a

12    foundational basis to testify.

13         So our initial thought was that we weren't offering him as

14    an expert.  Our initial thought was to offer him as a lay

15    witness.  And we understand that there's limitations to lay

16    witnesses.

17         The defense briefed it, complaining about him being an

18    expert.  But what Mr. Cassman argued was a hearsay objection,

19    and that's not really the way it was briefed.  So the argument

20    is a little bit different than the briefing.

21         **THE COURT:**  All right.

22         **MR. NEDROW:**  We recognize there's hearsay limitations to

23    what Mr. Scocca could testify to.

24         **THE COURT:**  Okay.

25         **MR. NEDROW:**  And we could call him to testify as a

1    firsthand witness to what he might --

2        THE COURT:  All right.

3        MR. NEDROW:  -- testify to.

4        THE COURT:  So I am going to deny this motion with the

5    understanding that there are certainly limits, especially on

6    Mr. Scocca, if he were to testify about the results handed to

7    him by a third party.  That would not be admissible.  That

8    would be objectionable, and you will advise him that he's not

9    to testify on that.

10        But in terms of his everyday job and what he personally

11    did in this -- for these documents that are at issue, I am --

12    I think that that is perfectly appropriate and that he can

13    authenticate, certainly, some of these documents that he pulled

14    from the computers.

15        And with the explanation that Mr. Tanaka will be only one

16    of a number of witnesses, it appears that maybe too much

17    evidence is placed on the shoulders of Mr. Tanaka in the

18    defenses' eyes and, in fact, it's going to be spread among a

19    number of people, including engineers.  Mr. Tanaka is not an

20    engineer himself.

21        MR. NEDROW:  Yes, that's correct, Your Honor.

22        And, in fact, I should just be clear about this with

23    counsel, that the weight of that testimony is going to be

24    Mr. Burrows and Mr., I believe -- there's a name I didn't

25    mention -- Mr. Kappurao, I believe it is, and also possibly

1   Mr. Pinto.

2       And, of course, we're not foreclosing calling Mr. Tanaka

3   as a witness.  But --

4       **THE COURT:**  Sure.

5       **MR. NEDROW:**  -- the three individuals that's mentioned,

6   I believe all three of them are of a technical background; and

7   they're the ones who, I believe, you'll be hearing more of that

8   testimony.

9       **THE COURT:**  So there are limits to this, Mr. Cassman.

10  There's no question.

11      I think at the level of your motion, that I am going to

12  deny it without prejudice to your objections during the course

13  of the testimony if these lay witnesses cross the line.  They

14  can give lay opinions.  They can't give expert opinions.  But

15  it seems to me that they are well within the framework of 701

16  in allowing their testimony.  So I think we're all going to

17  have to just be on our toes at trial to see where I draw those

18  lines.

19      **MR. CASSMAN:**  Well, I understand that, Your Honor.  But I

20  do want to point out that he still hasn't said what witness

21  they are going to present who's going to address Dr. Chen's

22  PowerPoint.

23      **THE COURT:**  But that's not before me right now.

24      **MR. CASSMAN:**  And so we want to lay our marker that we

25  will vehemently object to presentation of any opinion evidence

1  that there was confidential information or trade secrets in any

2  of Dr. Chen's PowerPoints that were presented.

3      **THE COURT:**  So that's a different issue.  And you're

4  talking -- you may be just talking to me to send a message to

5  Mr. Nedrow, but I'm not really -- I'm not absorbing that right

6  now because that's not before me.

7                        (Laughter.)

8      **THE COURT:**  Okay.  Let's go on to Number 6, to exclude

9  character evidence concerning defendants.

10      The Government says it has none.  There's no opposition,

11  and so that one is granted.

12      I might make it today.  We might actually finish.

13      Okay.  In Limine Motion Number 7 -- this one gets a little

14  harder -- to exclude co-conspirator statements not supported by

15  proper foundation.

16      So this one, essentially, is a grant with a big

17  understanding that the Government is well aware of the

18  foundation it needs to lay, and it's a game-time decision for

19  me to evaluate the evidence before the -- to evaluate the

20  foundation before the substantive evidence is submitted.

21      So I don't know what more I can say on this, except to

22  grant it.  It puts the Government on notice, but it doesn't --

23  I'm not precluding them from doing anything at this point.

24      **MR. GOLDMAN:**  That's fine, Your Honor.

25      **MR. NEDROW:**  If I may, very briefly, Your Honor.

1     **THE COURT:**  Yes.

2     **MR. NEDROW:**  The only point I would make on this is -- and

3     we don't have to answer it right now.  But there's a procedural

4     question.  There are some cases that, I think -- I don't know

5     how to pronounce it.  The B-o-u-r-j-a-i-l-y case, *Bourjaily*

6     case, talks about --

7     **THE COURT:**  *Bourjaily*, yeah.

8     **MR. NEDROW:**  -- having a hearing where --

9     **THE COURT:**  Right.

10    **MR. NEDROW:**  And if I may just kind of get maybe the point

11    on it, Your Honor -- and defense knows this -- there are many,

12    many e-mails in this case.  In fact, a lot of the exhibits

13    the Government will offer in this case are e-mails.  And one

14    question just to throw out there is what would be a procedure.

15        The Government can submit, of course, a filing with,

16    you know, dozens or approximately a hundred or so, or maybe

17    more than a hundred e-mails that we're going to offer with a

18    showing of proof as to the Government's view as to how they fit

19    within the conspiracy.  We submitted five in connection with

20    our motion, and it would look something like that but expanded.

21    And then we can also take it case by case as we go along.

22        And I throw that out in the sense that we will make our

23    showing and we're happy to go about that in whatever orderly

24    procedure makes sense, whether it's an out-of- --

25    **THE COURT:**  So --

1        **MR. NEDROW:**  -- -presence hearing.  Yes.

2        **THE COURT:**  And thank you for raising that, because I had

3   a note and I just passed right over it.

4        And I have the *Bourjaily* case here, B-o-u-r-j-a-i-l-y.  So

5   the Supreme Court talks about the Court determining this by a

6   preponderance of the evidence.  It's not clear whether it needs

7   to be an evidentiary hearing on the record or whether it can be

8   submitted.  But what the showing needs to be -- and this is

9   raised in the objection -- is what exactly are the dates of the

10  conspiracy and what is the evidence that -- what evidence do

11  you submit showing that the statement was made during the

12  course and in furtherance of the conspiracy.

13       And so that would at least require each of the e-mails to

14  be provided.

15       **MR. NEDROW:**  Yes.

16       **THE COURT:**  And this, I think the defense calls it, "offer

17  of proof," which would be in writing, submitted.

18       So, Mr. Cassman, did you foresee an oral evidentiary

19  hearing on this or a -- you said "offer of proof" -- or a

20  written submission by the Government?

21       **MR. CASSMAN:**  We would certainly anticipate a written

22  submission from the Government.

23       **THE COURT:**  Okay.

24       **MR. CASSMAN:**  And then, if we have objections, we'll bring

25  them to the Court's attention.  Whether an actual hearing is

1   required, we'll find out.

2       **THE COURT:**  Well, not much more we can do on that before

3   you see the filing.

4       **MR. CASSMAN:**  Right.

5       **THE COURT:**  So my concern is time.

6       **MR. CASSMAN:**  Right.

7       **THE COURT:**  I'm going to be -- right now, I'm going to be

8   in trial the week before this one.  And so that trial starts on

9   July 16, and so if there needs to be any evidentiary hearing,

10  it needs to be -- and I don't know what I have on the 15th,

11  whether I have something in the afternoon on the 15th.

12      **THE CLERK:**  You do not, Your Honor.

13      **THE COURT:**  We do not.  Okay.  That's good to know.

14      All right.  Mr. Nedrow, I think you're going to have to

15  make that offer of proof.

16      **MR. NEDROW:**  Yes, Your Honor.

17      **THE COURT:**  And as I say, it's a preponderance of the

18  evidence standard.  And so you'll do that, and then -- but time

19  is very short on this.  So I guess I'm going to need you to

20  file that by the 2nd.

21      **MR. NEDROW:**  Yes, Your Honor.

22      **THE COURT:**  And then any opposition and request for

23  hearing will need to be filed by the 8th.

24      And then, if there's going to be a hearing, it would be on

25  July 15 at 1:30.  And I don't know whether there'd be witnesses

 1    on that.  I'm not quite sure what a hearing would look like.

 2    So it may be that the defense submits objections and argument

 3    on a failure of proof as opposed to an evidentiary hearing.

 4         **MR. CASSMAN:**  That sounds appropriate.

 5         **THE COURT:**  That'd be great.

 6         **MR. GOLDMAN:**  Your Honor, I think I may have -- I just

 7    missed something.  So what are the dates for filing the --

 8         **THE COURT:**  So the Government will file its offer of proof

 9    by July 2.

10         **MR. GOLDMAN:**  Okay.

11         **THE COURT:**  The defense will file any objections by

12    July 8.

13         **MR. GOLDMAN:**  Got it.

14         **THE COURT:**  And then, if there's a hearing, it will be

15    July 15th at 1:30.  Okay?

16         **MR. GOLDMAN:**  Thank you, Your Honor.

17         **MR. CASSMAN:**  Yes.  Thank you, Your Honor.

18         **THE COURT:**  Okay.  So, I mean, sort of the odd thing about

19    this motion is that I'm going to -- let me just -- I'm not sure

20    what -- maybe I'm doing nothing on this yet.

21                        (Laughter.)

22         **THE COURT:**  Well, you actually asked me to exclude

23    statements not supported by a proper foundation, and I would do

24    that.

25         **MR. CASSMAN:**  Excellent.

1        **THE COURT:**  I have every intention of doing that.

2        **MR. CASSMAN:**  Thank you, Your Honor.

3        **THE COURT:**  So I will do that.  But I'm making no finding

4   whatsoever that there's an absence of proper foundation for any

5   exhibit.  So in a sense, that becomes an easy one, doesn't it?

6        **MR. CASSMAN:**  Yes.

7        **THE COURT:**  All depends on how you frame the question.

8        Okay.  Number 8, implement Rule 16 by excluding any

9   statements of defendants not previously produced.

10       There's no opposition to this one.  The Government

11  acknowledges its continuing obligation and also indicates,

12  I believe, that it's not aware of any failure to produce the

13  required documents.

14       But that one is granted.

15       Okay.  Number 9, to admit evidence related to the civil

16  case and for judicial notice.

17       So let's see if we can walk through this one.  I think

18  we've made some headway, frankly.

19       I have denied introduction of the state court denial of

20  the TRO, or the TRO order.

21       There is the -- let's see.  I had a list of about six

22  things.

23       I will grant the motion to allow evidence about the

24  existence of the state court civil action, and I will grant as

25  to the fact of denial of the TRO.

1    And to the extent you need me to take judicial notice of

2    that fact as the evidentiary foundation, I can do that.  I

3    don't know how you want me to do it, whether in this in limine

4    order.  Is that sufficient?  Do you want it in some other way?

5    **MR. CASSMAN:**  Why don't we see if we can work out a

6    stipulation with the Government and propose it to the Court.

7    **THE COURT:**  That's great.

8    I will grant the motion as to the Olgado stipulation.

9    That's unopposed.

10    And then we get to the hard one, which is, of course, the

11    Chen declaration.  So I think, when I look at the timing of the

12    Chen declaration, it clearly was written after the civil suit

13    was filed and in response to being civilly charged with theft

14    of trade secrets.  And so it, at most, is Dr. Chen's state of

15    mind after his employer has accused him of civil wrong.  And it

16    may even be that Dr. Chen was aware of the potential of a

17    criminal indictment.  I'm not certain on that myself.

18    So I don't actually think it provides his state of mind

19    during the existence of the conspiracy.  And I don't know that

20    the Government argues that the conspiracy continued after the

21    filing of the civil suit.  I'm not certain on that.  I don't

22    think the Government has said.

23    And I also think -- I'm trying to make sure that I don't

24    trample on the defense's right to impeach the Government's

25    investigation.  But as I recall -- and correct me if I'm

1  wrong -- Agent Trombetta was unaware of the content of the Chen

2  declaration.

3      **MR. CASSMAN:**  Yeah.  That is incorrect.

4      **THE COURT:**  That's incorrect?

5      **MR. CASSMAN:**  Yeah.

6      **THE COURT:**  She had it?

7      **MR. CASSMAN:**  She had a copy of it.

8      **THE COURT:**  Okay.  But she didn't have the TRO order.

9      **MR. CASSMAN:**  That's correct, Your Honor.

10      **THE COURT:**  Okay.  So she did have it.  I mean, I know we

11  went through this on the suppression motion and the *Franks*.

12  She did not inform the magistrate in state court -- was it in

13  state court?  No.  Here.  Our magistrate.

14      **MR. CASSMAN:**  Federal magistrate.

15      **THE COURT:**  -- of the existence of the Chen declaration.

16      And frankly, I found then, and I still feel, that a

17  suspect's self-serving statement is not -- which is what I

18  consider this declaration to be; it's in response to a

19  lawsuit -- I don't think it's actually relevant to -- I mean,

20  the jury may find it relevant that she did, and I'm not taking

21  that away from your argument to the jury.  But I don't think

22  that -- I'm not going to admit the Chen declaration.  I think

23  that --

24      **MR. CASSMAN:**  Can I say something --

25      **THE COURT:**  Sure.

1      **MR. CASSMAN:**  -- please?

2          I'm not going to call it fundamental to our defense,

3      Your Honor, but it is integral and central, the whole civil

4      litigation.  And I think it's going to infuse the case, as well

5      as the defense.

6          I think that they won't tell you that the conspiracy had

7      discontinued because that would be a very fine parsing of

8      what's going on here.

9      **THE COURT:**  Okay.

10     **MR. CASSMAN:**  They certainly allege an overt act on

11     December 9th, and the declaration was filed on December 14th.

12     **THE COURT:**  Okay.

13     **MR. CASSMAN:**  The declaration, they can argue, and I'm

14     sure they will very aggressively argue when it's admitted into

15     evidence to the jury, is self-serving and shouldn't be relied

16     upon.  It's unreliable, et cetera.

17         But we will argue that it was a current statement of our

18     client's belief that these items referred to in his PowerPoint

19     presentations were in the public domain, that he had done

20     nothing wrong.  And a judge agreed with him, as we know.

21     **THE COURT:**  But, Mr. Cassman, how would that be any

22     different than after the indictment is filed in federal court,

23     that Dr. Chen sat down and wrote a declaration confessing his

24     innocence in a case?  He can't use that --

25     **MR. CASSMAN:**  Two ways.

1        **THE COURT:**  -- without testifying.

2        **MR. CASSMAN:**  Two ways.

3        **THE COURT:**  Yes.

4        **MR. CASSMAN:**  It's concurrent and during the alleged

5   conspiracy.  It is.  They can't say it's not because they won't

6   dare because they have to prove an overt act that occurred

7   during that time, and they haven't told us when it stopped yet.

8        **THE COURT:**  No, they haven't.

9        **MR. CASSMAN:**  So they're going to continue to do it.

10       So it's during the conspiracy.  And it's a statement

11  that's not in response to an indictment after the fact.  It's a

12  statement that is expressing his belief and knowledge and then

13  citing to --

14       **THE COURT:**  Well, it's a complete --

15       **MR. CASSMAN:**  -- materials that are in the record.

16       **THE COURT:**  When I go through the declaration, he takes

17  Mr. Tanaka's declaration apart piece by piece.

18       **MR. CASSMAN:**  Yes.

19       **THE COURT:**  It's not his -- and that's what it is.  It's

20  obvious to anyone reading it that that's what he's doing.  He's

21  telling the Court why Mr. Tanaka was wrong at every step.

22       **MR. CASSMAN:**  Yes, that's true.  And we realize that there

23  are parts of the declaration that probably are not appropriate

24  for admission before the jury.  We have gone through ourselves

25  and highlighted those portions that we believe are and should

1   be in front of the jury, and I would ask to present the Court

2   with that at this time.

3        **THE COURT:**  So I'm more than glad to look at that.

4        I wasn't looking at his declaration as part of it could

5   come in.  I'm really at the level that I think the Government

6   has objected to this, is that this is a statement, a

7   self-serving statement offered by the defendant.  And he has

8   the right not to testify, but he does not have the right to

9   offer his testimony through the back door.  And I think this

10  blows a hole in the entire rule if someone could just leave

11  little bread crumbs along the way.

12       And it's really driven by the fact that this declaration

13  came after he was sued in the civil suit.  I think that's a

14  really -- I think that's a really key thing.  This was a

15  defensive posture when, in fact, it doesn't even bear any of

16  the hallmarks of being true.  I know you're not offering it

17  for -- you don't deny that it's hearsay.  But in terms of his

18  state of mind, I mean, I just don't think that that -- that

19  hole is not that big.

20       **MR. CASSMAN:**  So let me tell you my second reason

21  I believe it's admissible.

22       **THE COURT:**  Okay.

23       **MR. CASSMAN:**  Had he been sued and not filed an answer,

24  had he been sued and fled the country, had he been sued and

25  taken some evasive action, the Government would be arguing that

his failure to respond, his failure to answer his actions were
consciousness of guilt.

    We believe that his answer and its convincing,
comprehensive nature was consciousness of innocence; that this
was a demonstration that evinced his good faith in response to
the accusation.

    **THE COURT:**  So I thought that was an interesting argument
that you made in your papers, and you cited a case from out of
district.

    But the reason, in my view, that under the Evidence Code
the consciousness of guilt is allowed is that people don't
normally do things that show that they're guilty, but lots of
people do things to put themself in the false light of being
honest and truthful.

    **MR. CASSMAN:**  So that's something they can argue.

    **THE COURT:**  Well, no.

    **MR. CASSMAN:**  You're saying we shouldn't be able to draw
the inference we want because the inference -- that you believe
the inference they're arguing for is more persuasive.

    **THE COURT:**  No.  It's not about the inference.  I think
it's a self-serving statement offered in lieu of his testimony,
and I think it's at a pretty simple level that it's
inadmissible.  And I don't accept your statement that it shows
state of mind with this nuance of when the conspiracy may or
may not have ended.

1          I know that the Government has not laid a marker in the

2     papers I received on when the conspiracy ended, and so I can't

3     make any assumption on that, and I don't know that the jury

4     will be asked to make that determination.  I just know that it

5     came after the civil suit was filed.  So it's self-serving.  I

6     mean, I can't think of something that's more self-serving

7     that's written when you have to defend yourself against serious

8     action being taken against you that would be potentially

9     ruinous to you.

10         **MR. CASSMAN:**  Well, that's certainly one inference that

11    they can argue for.  We would argue for the other.

12         And I would ask the Court, then, to take judicial notice

13    of the fact that the declaration by Dr. Chen was filed in the

14    civil matter in opposition to the application for a TRO.

15         **THE COURT:**  All right.  Mr. Nedrow, do you want to make

16    any comments here?

17         **MR. NEDROW:**  Yes, Your Honor.  Just that there's no

18    persuasive law supporting the defense position.  It's plainly

19    not admissible.  The Court's exactly right.

20         If it were admissible, every case would be susceptible to

21    a defendant writing their declaration as to how they're

22    innocent or not civilly liable, putting it in, and sitting back

23    and saying, you know, "I'm not putting anything on" and just

24    putting it in through that mechanism.  And the law does not

25    support that.  The hearsay rule is designed against that.

1          There's a straight argument from the defense which is

2     disproportionate to a total absence of legal authority, is what

3     the defense is asking you to do.  And it's not, frankly, about

4     the Court picking an inference.  It's about following the law

5     and what the rules are.  And, of course, the Court's doing

6     that.  And the law and the rules do not allow defendants to do

7     this.

8          So we appreciate the Court's assessment on that, and we

9     don't think it should be admitted.

10         **THE COURT:**  Do you object to evidence of the fact that

11    there was a declaration?  Because I do think it may be relevant

12    to the defense evidence on the thoroughness of the Government's

13    investigation that the Government had a declaration and didn't

14    consider it.  So it's without disclosing what's in it; just the

15    existence of it.

16         **MR. NEDROW:**  And, Your Honor, I respect that; and I

17    understand how, as the case proceeds, there may be a reference

18    to the existence of the civil suit.

19         For example, as the Court noted, the Government is, with,

20    I understand it, Mr. Olgado, jointly agreeing that in some

21    manner the Olgado stipulation gets into --

22         **THE COURT:**  Right.

23         **MR. NEDROW:**  -- evidence.

24         So, therefore, there's a need to acknowledge the existence

25    of the separate civil proceeding.  So we respect that.

1      **THE COURT:** Okay.

2      **MR. NEDROW:** And, however, I think the concern I have is

3      that how clear the Government's opposition needs to be that the

4      defense, you know, cannot, if the Court rules this way, and

5      should not be permitted to allude to the types of things that

6      have been argued, because there's a lot of interest in that and

7      it's completely improper.

8      **THE COURT:** All right. Then let me just round up on

9      Number 9. I will deny the request to admit the Chen

10     declaration, but I will grant the request on the existence of

11     the Chen declaration without any reference to the content of

12     it, other than that it was submitted in opposition to the TRO,

13     which was then denied.

14         That is just the basic factual statement of the civil

15     suit, and I will allow that. I think it actually goes directly

16     to the defense case on questioning the thoroughness and

17     appropriateness of the Government investigation.

18         Okay. Number 10 probably won't take long. It's Motion in

19     Limine Number 10, objection to multiplicity of charges.

20         The parties recognize that this matter needs to be

21     deferred. May I just ask one question? Is this really just a

22     sentencing issue?

23     **MR. GOLDMAN:** Yes, Your Honor. And we anticipate it will

24     be obviated by not guilty verdicts but --

25     **THE COURT:** There you go.

1      **MR. GOLDMAN:**  -- we're just placing a flag in the ground,

2    just in case.

3      **THE COURT:**  Okay.  Thank you.  So Number 10 is simply

4    deferred.  And thank you for alerting me to the issue.

5      In Limine Motion 11, Chen and Ewald's motion to exclude

6    inculpatory statements made by co-defendants or, in the

7    alternative, to sever the trials.

8      And so this clearly has to do with statements that might

9    be offered by Mr. Hsu and Mr. Olgado.

10      **MR. GOLDMAN:**  It's their statements that might be offered

11    against them, more specifically.

12      **MR. CASSMAN:**  The Government --

13      **THE COURT:**  Against them, right.

14      **MR. CASSMAN:**  Yes.

15      **THE COURT:**  Statements offered by Hsu and Olgado

16    against --

17      **MR. GOLDMAN:**  No.  Statements of --

18      **THE COURT:**  -- Chen and Ewald?

19      **MR. GOLDMAN:**  Alleged statements of defendants Olgado and

20    Hsu that the Government may introduce that may tend to

21    incriminate Dr. Chen --

22      **THE COURT:**  Right.

23      **MR. GOLDMAN:**  -- and Mr. Ewald.

24      **THE COURT:**  Okay.  Yes, I've got it.

25      Okay.  Anything else you want to say?  I'm not inclined --

1    I'm inclined to deny this.

2        **MR. GOLDMAN:**  Well, I'll just submit on the *Bruton* issue,

3    Your Honor.

4        There is a more garden-variety evidentiary issue that

5    the Government didn't address, which is just, these are

6    post-alleged conspiracy statements that may be admissible

7    against the --

8        **THE COURT:**  Is that right?  I didn't make a note of that.

9    So I don't recall reading that in the briefs.

10                (Co-counsel confer off the record.)

11       **MR. GOLDMAN:**  No.  They're in January.

12       **THE COURT:**  I'm sorry.

13       **MR. NEDROW:**  No.

14       **MS. KNIGHT:**  They're in December.

15       **MR. GOLDMAN:**  Am I wrong about that?

16       **THE COURT:**  I see December 3 and December 10 for

17   interviews.

18       **MR. GOLDMAN:**  Oh.  My apologies.  I guess they are

19   within -- so to the extent they're considered in furtherance of

20   the conspiracy, then they may come in under that basis.

21       To the extent they're offered against the defendant as a

22   party admission, they're only admissible as against certain

23   defendants, and there will have to be a limiting instruction.

24       **MR. NEDROW:**  And that's fine, Your Honor.  That's fine.

25   We accept that if those statements are admitted, we would take

1    care to redact references that were arguably inculpatory as to

2    Dr. Chen or -- I guess it would be Mr. Ewald.  In other words,

3    it would only be admissible against the people making the

4    statements.

5        THE COURT:  Against the declarants.

6        MR. NEDROW:  Correct.

7        THE COURT:  So these interviews are not offered in

8    furtherance of the conspiracy?

9        MR. NEDROW:  They're not.  They're not, no.  The defense

10    continues to return to that theme.  But they're admissions.

11    They're admissible admissions, 801(d)(2)(A) admissions.

12    However, we agree that in the context, they would not be

13    admissible against non-declarants.  They're only admissible

14    against the declarants themselves.

15        THE COURT:  Okay.  I did not see anything in the papers

16    that led me to believe that Mr. Hsu or Mr. Olgado made any

17    incriminating statements against Dr. Chen or Mr. Ewald.  I

18    don't see this as a *Bruton* issue.  I don't see it under

19    *Richardson* v. *Marsh*.  There's no powerful facially

20    incriminating confession that implicates a co-defendant.

21        And so I am going to deny this, with the understanding

22    that the Government fully understands its obligation to submit

23    a limiting instruction; or for the defense, if these statements

24    are offered against the declarants themselves, then the jury is

25    to disregard them as to other defendants.

```
 1        I will the deny the motion to sever.
 2        MR. GOLDMAN:  And we'll be pleased to talk to
 3   the Government about redactions to this.
 4        THE COURT:  That's great.
 5        Okay.  Last one.  I've got one minute.
 6                    (Laughter.)
 7        THE COURT:  I don't mean to rush, but I always like to be
 8   on time.
 9        Okay.  Number 12, foundational requirements and/or
10   exclusion of evidence concerning private procedures, policies,
11   and memoranda.
12        My review of this was that there is no heightened
13   standard.  There's always a standard, a foundational
14   requirement.  But are you arguing a heightened standard for
15   these policies and procedures?  No.
16        MR. ALTSCHULER:  No, Your Honor.
17        THE COURT:  All right.  So this is just the basic -- I'm
18   going to have -- okay.
19        MR. ALTSCHULER:  I'm not sure it's the best idea to start
20   this at 30 seconds to the hour.
21        THE COURT:  No, no.  I'm not going to cut you off, but I'm
22   not really seeing that there's -- so the internal policies and
23   procedures are absolutely relevant to the elements of the
24   crime.
25        I mean, for example, the reasonable steps that the company
```

```
 1   took to protect its confidential information is an essential
 2   element of the crime.  And the policies and procedures are
 3   generally the way that that's established.
 4        Whether you have evidence that they had nice policies and
 5   didn't follow them is all fair game.  And I don't know what the
 6   evidence will be.  But the Government is certainly allowed to
 7   present the policy book of how they protect their materials.
 8   You don't disagree with that, do you, Mr. Altschuler?
 9        MR. ALTSCHULER:  Not in the least.
10        THE COURT:  Okay.
11        MR. ALTSCHULER:  The fact is, if the Government offers it
12   for the purpose the Court just described, then we think that
13   the Government cannot later argue it for a different purpose.
14        THE COURT:  Okay.
15        MR. ALTSCHULER:  But there's no question that --
16        THE COURT:  Sure.
17        MR. ALTSCHULER:  -- reasonable -- were the policies
18   reasonable?  Were they adequate?  That comes in.
19        THE COURT:  Okay.  And then, to the next step.  If
20   the Government offers the policies for the proposition that the
21   defendants knew of the restrictions, this gets to, then, again,
22   they have to have evidence of the practice of the company of
23   how people knew that.
24        And so where you might argue that they don't have his
25   signature on an employee handbook every year that says "I read
```

 1   and understand these policies," that can go to the jury; but if

 2   the company wants to offer witnesses who testify that

 3   "Every year we send out an e-mail to everyone, telling them

 4   about the policies and reminding them, and it's company policy

 5   that the employees read and understand those," it's all

 6   evidence the jury can consider as to whether any of these

 7   defendants knew of the policies and knew of their obligation to

 8   follow them.

 9        **MR. ALTSCHULER:**  Without knowing right now how

10   the Government intends to prove that up, it's difficult to say

11   that the notice would be adequate because we don't know.  I do

12   know that there's a whole host of policies -- there's a whole

13   host of items which may be policies or may be e-mails.  And in

14   a way, frankly, it's similar to some of the other issues that

15   have been before the Court earlier today.

16        **THE COURT:**  Yeah.

17        **MR. ALTSCHULER:**  And it may be that the best way to deal

18   with this is simply on a case-by-case basis.

19        **THE COURT:**  So I don't think it's an admissibility issue.

20   I think it's a persuasion issue to the jury.

21        **MR. ALTSCHULER:**  I beg your pardon?

22        **THE COURT:**  I don't see this as an admissibility issue.

23   I think it's a persuasion issue to the jury.  I think that the

24   company's practices and policies about confidentiality and how

25   they apply those policies to a variety of confidential and

1    proprietary information is something the jury can consider in

2    determining both the reasonableness of the steps and whether it

3    tends to prove knowledge on the part of the defendants.

4        And I don't see that -- I disagree with you that there's a

5    requirement to show that the internal policies that are offered

6    were specifically and narrowly tied to the defendants'

7    authorization to access to the trade secrets.

8        You may persuade the jury that these policies would not

9    have put the defendants on notice of their obligations, and

10   that's fine.  But I think it's an issue of persuasion and not

11   admissibility.

12       So I'm going to deny in Limine Motion Number 12.

13       And, of course, proper foundation has to be laid.

14       **MR. NEDROW:**  Yes.

15       **THE COURT:**  Okay?

16       Well, four minutes late.  So I don't believe we need to

17   come back next Tuesday.  We've gotten through these.  I will

18   give you a written order.  I'm sure you'll want a transcript.

19   We've been over a lot today.

20       I want to just say before we break that there were a lot

21   of motions.  I thought the briefing was really attuned to an

22   economy of presentation, and I thought that the motions and

23   oppositions were extraordinarily clear.  You really gave me

24   what I needed to assess these issues.  And I really want to

25   thank you for that.  That doesn't come easily, and it really

1  exhibited an extraordinary amount of work from everyone.  So

2  thank you.

3      **MR. CASSMAN:**  And we found out we don't need footnotes,

4  Your Honor.

5      **THE COURT:**  I know.  It's amazing, isn't it?  Isn't it

6  amazing how you don't need them?

7                          (Laughter.)

8      **MR. CASSMAN:**  A few items for the laundry list.

9      We submitted voir dire questions, but we believe they're

10  basically rendered moot by the --

11      **THE COURT:**  That's right.

12      **MR. CASSMAN:**  -- questionnaire and the discussion --

13      **THE COURT:**  Correct.

14      **MR. CASSMAN:**  -- we had.

15      **MS. KNIGHT:**  We agree, Your Honor.

16      **MR. CASSMAN:**  We submitted the instructions.  I know

17  the Court has not had an opportunity to look at them yet.

18      Counsel for the Government and we have discussed that

19  we're not satisfied with the conspiracy instructions,

20  Number 38, both parties, that we submitted opposing.  And we

21  propose to address it again over the next week and submit

22  another proposed instruction with identified specifically what

23  dispute, if any dispute, exists, for the Court.

24      **THE COURT:**  That's fine.  And so we're going to meet on

25  the afternoon of the 22nd of July.  And so it sounds like

1    you'll submit something that will withdraw the current version

2    of that instruction and substitute a new one.  And if it's

3    disputed, then you'll give me -- you'll repeat -- you'll give

4    me anew the entire instruction.  That'd be great.

5        **MR. CASSMAN:**  Okay.

6        **THE COURT:**  That'd be great.

7        **MR. CASSMAN:**  And I raised the issue of a possible Rule 15

8    deposition.  We'll discuss that --

9        **THE COURT:**  Yes.

10        **MR. CASSMAN:**  -- with the Government.

11        And there's also an issue of appeal of denial of a

12    subpoena.

13        **THE COURT:**  Oh, I saw that; that that was denied.

14        **MR. OLMOS:**  Right.  In the text order.  Yes, Your Honor.

15    So we do intend to appeal that to Your Honor, and we will do

16    that just as soon as we can.

17        **THE COURT:**  So please understand, I am away from July 3rd

18    through 10th.  Just FYI.

19        **MR. OLMOS:**  Understood.

20        **THE COURT:**  Okay?

21        **MR. OLMOS:**  Thank you.

22        **THE COURT:**  Mr. Altschuler?

23        **MR. ALTSCHULER:**  Your Honor, I think I understood

24    the Court to say that we were supposed to furnish personal

25    e-mail addresses.  Is that --

1    **THE COURT:** Would you leave that --

2    **MR. ALTSCHULER:** -- today?

3    **THE COURT:** -- with Tiffany.

4    You're all here.  It would be great so she doesn't have to

5    call you.  An e-mail for each of the parties where -- someone

6    who will be reading their e-mail.  If you're one of those

7    people who puts a pop-up and you don't read your e-mail, that

8    wouldn't be a good one.  But I do use the e-mail a lot.

9    And then, when I have all your e-mails, I can send you an

10   e-mail.  You know our convention for our e-mails.  It's not

11   hard for you to figure out what my e-mail is.  Okay?  That'd be

12   great.  That would be great.

13   All right.  Well, thank you, all.

14   For the jury instruction conference, I generally do it off

15   the record and informally.  And the parties are welcome to be

16   here, but they're not required.  I mean, there aren't many

17   disagreements, but we're just talking about the law.  I don't

18   think -- I mean, as I say, I don't exclude the parties, but it

19   can't be interesting to them.

20   So, and is there any objection to that being off the

21   record?  I'll give you an opportunity to make a record of it,

22   but it's kind of a meandering conversation, frankly.

23   **MR. CASSMAN:** No, Your Honor.  I assume afterwards, we'll

24   put on the record whatever needs to be --

25   **THE COURT:** Absolutely.

1    **MR. CASSMAN:**  -- put on the record.

2    **THE COURT:**  Absolutely.

3    Anything else before we conclude?

4    **MR. NEDROW:**  No.

5    **MS. KNIGHT:**  No, Your Honor.  Thank you.

6    **MR. CASSMAN:**  No, Your Honor.

7    **THE COURT:**  Thank you, all.

8    **THE CLERK:**  Court is adjourned.

9            (Proceedings adjourned at 5:06 p.m.)

10                    ---oOo---

11

12            **CERTIFICATE OF REPORTER**

13        I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15

16    DATE:  Monday, June 28, 2021

17            _Ana Dub_

18    _____

19    Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
            Official United States Reporter

20

21

22

23

24

25